**BAKER HUGHES OILFIELD OPERATIONS, INC.,**
Appellant,

v.

**James M. WILLIAMS, Appellee.**

No. 01–08–00762–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

March 10, 2011.

Rehearing Overruled May 19, 2011.

Mark J. Oberti, for Baker Hughes Oil-field Operations Inc.

Peter Costea, David M. Gunn, Erin H. Huber, for James M. Williams.

Panel consists of Justices JENNINGS, HIGLEY, and SHARP.

## OPINION

TERRY JENNINGS, Justice.

Appellee, James M. Williams, has filed a motion for en banc reconsideration from this Court's June 10, 2010 opinion. In light of the motion, we withdraw our opinion and judgment of June 10, 2010 and issue this opinion in its stead. We overrule the motion for reconsideration en banc as moot. *See Brookshire Brothers, Inc. v. Smith,* 176 S.W.3d 30, 33 (Tex.App.-Houston [1st Dist.] 2004, pet. denied) (op. on reh'g) (noting that motion for en banc reconsideration becomes moot when panel issues new opinion and judgment).

Appellant, Baker Hughes Oilfield Operations, Inc. ("Baker Hughes"), challenges the trial court's judgment entered, after a jury trial, in favor of appellee, James M. Williams, in his suit against Baker Hughes for racial discrimination in violation of the Texas Commission on Human Rights Act (the "Act").[1] In the first four of its issues, Baker Hughes contends that the evidence is legally and factually insufficient to support the jury's findings that race was a motivating factor in Baker Hughes' decision to terminate Williams's employment. In its fifth issue, Baker Hughes contends that the compensatory damages award is excessive.

We reverse and render.

## Factual and Procedural Background

In his petition, Williams, an African–American, alleged that he began working as a machinist at a Baker Hughes facility in 1993. On January 31, 2003, Gilbert Schulz and Brian Fendley, two white supervisors in the fishing tools section in which Williams worked, terminated his employment as part of an alleged larger pattern of discharging all the black machinists in the fishing tools section and "replacing them with Hispanic machinists." According to Williams, Schulz and Fendley used "poor performance" as "a mere pretext for the discriminatory termination" of his and the other black machinists' employment, and Baker Hughes, because of his race, had treated him less favorably in his employment, compared to other employees.

At trial, Williams testified that he had worked at the same Baker Hughes facility from 1993 to 2003 with a good employment history.[2] In 2001, Baker Hughes created at the facility the fishing tools section, in which tools used in offshore drilling were manufactured. Williams was assigned to this section, and the supervisors of the section, Schulz and Fendley, reported to Lindsay Self, a production manager at the facility who supervised all of the machinists and welders at the facility.

Williams acknowledged that in November 2002, he signed a document circulated by his supervisors attesting that he would comply with, among other things, Baker Hughes' manufacturing procedure "M01.090," which the parties also refer to as an "ISO procedure." The M01.090 procedure "define[d] the actions [to be] taken when nonconforming product [was] detected in the manufacturing process," it applied to all Baker Hughes manufacturing personnel, and it required operators to notify a "supervisor" upon finding a nonconformance in a product. Williams also

---

1. *See* Tex. Lab.Code Ann. §§ 21.001–.556 (Vernon 2006).

2. Schulz and Fendley agreed that Williams had a positive work history.

acknowledged that in January 2003, he violated the M01.090 procedure by failing to notify his supervisors, Schulz and Fendley, when he discovered that he had milled a nonconforming part. Williams explained that he had received a work order to mill a two-part tool from furnished materials, he made a conforming part from the furnished materials when milling the first part of the tool, but he created a nonconforming part when milling the second part of the tool. Williams knew at that time that he had erred and created a nonconforming part, but rather than notify Schulz and Fendley, he instead told Moises Banda, another machinist working in the fishing tools section.

After Williams told Banda that he had made a nonconforming part, Banda told Williams to search the work station for another piece of material from which to mill a replacement for the nonconforming part. Williams then found another piece of scrap material and, as suggested by Banda, milled the second part and sent the entire tool through the manufacturing process. In explaining how he had selected the scrap material to use in remaking the second part, Williams noted that he matched the "heat number" reflected on the blue print for the tool. However, subsequent, undisputed testimony revealed that this measure did not ensure that the scrap material was of the same hardness and required specifications of the furnished material.

Williams further testified that it was common practice among machinists to go to Banda if they had a problem because the machinists viewed Banda as a "leadman" "to a degree," an "unknown leadman," or a "troubleshooter." However, Williams conceded that Banda was not an official Baker Hughes "leadman." Moreover, although Williams noted that the M01.090 procedure did not define the term "supervisor," he admitted that he knew, and in fact "everybody knew," that Banda was not a "supervisor," but was actually "just a machinist" like Williams. Williams agreed that no supervisor had given him permission to inform Banda, rather than a supervisor, in the event that he detected a nonconforming part, and Banda had not told Williams not to inform his supervisors about the nonconforming part.

Approximately one week later, the two-part tool with the replacement part milled by Williams was included among 10% of the parts tested by Baker Hughes' inspection department, and the replacement part failed inspection. The inspection department determined that the replacement part made by Williams was only one-third to one-half of the hardness of the material specified in the tool's work order and furnished to Williams. Williams agreed that had this defect not been caught by Baker Hughes in final inspection, the part could have caused a "dangerous" and "expensive" tool failure on an offshore or onshore well. When asked whether he had given any consideration as to whether the scrap material that he had used to mill the replacement part was of the same hardness as the material furnished to him, Williams agreed that he "never gave it a second thought." He conceded that it was not possible to determine the hardness of the material that he used through visual inspection or while he was machining it and that special instruments were required to actually determine the hardness of the material.

After learning of the inspection results, Fendley, who was confused about how the tool could have been made with inferior material, approached Williams to determine if he knew what had happened. Williams explained the sequence of events. The next morning, when Williams appeared for work, Fendley and Schulz met

with Williams and terminated his employment.[3] During this meeting, Fendley told Williams that his employment was being terminated because he milled a nonconforming part and reported it to Banda rather than his supervisors.

Fendley also provided Williams with a copy of a form "Discipline Report," in which in a section titled "Description of Violation," Fendley stated,

> James Williams milled two parts and one of these parts was scrapped in final inspection due to not passing a hardness check. I asked James if he knew anything about why there was a discrepancy between the two parts. He said he had messed up on one part, so he found replacement material and milled another part without notifying a supervisor. James is a senior machinist and has read and signed off on ISO procedures. The replacement material was not to BMS per print. If this was not found in inspection this would have caused a tool failure on the job. . . .

In the "Recommended Corrective Action" portion of the report, Fendley wrote, "Due to the severity of the violation, I am terminating [Williams's] employment effective immediately 1/31/03." Although it is not disputed that Williams had not previously violated the M01.090 procedure, Fendley, in a section titled "Has Employee Received Previous Warning," checked "Yes." After being given the opportunity to review and comment on the report, Williams signed the report without making any additional comments in the area allowed. Fendley and Schulz also signed the report.

Williams testified that he had committed the conduct that served as the basis for the termination of his employment and he deserved "some sort of discipline" for his conduct, but he stated that he was shocked by the termination in light of his "impeccable record" at Baker Hughes. However, Williams agreed that he did not know of any other employees at the Baker Hughes facility who had engaged in the kind of conduct in which he had engaged and had not had their employment terminated.

Williams did not present any direct evidence of discrimination. Instead, he attempted to present circumstantial evidence that Baker Hughes' reason for the termination of his employment was false and a pretext for racial discrimination. He also attempted to establish that he was treated less favorably than non-black workers. For example, Williams introduced evidence showing that he and other machinists had previously made nonconforming parts and their employment had not been terminated. Williams also highlighted that there was no Baker Hughes document expressly stating that the conduct for which his employment had been terminated was conduct for which Baker Hughes would actually terminate one's employment. Moreover, although he agreed that he had violated the M01.090 procedure and his violation could have had an expensive and dangerous consequence, Williams asserted that he and the other black machinists had been "eradicated" out of the fishing tools section by Fendley and Schulz. In support of this assertion, Williams presented evidence that the employment of approximately four to five other black machinists in the fishing tools section had been terminated during or shortly after his tenure at Baker Hughes and these black machinists had received numerous disciplinary reports only after Schulz and Fendley became supervisors in the fishing tools section. Williams also

---

**3.** Fendley testified that he discussed the appropriate course of action with Schulz, an unidentified human resources manager, Self, and Roger Hegel, the director of manufacturing, and they all supported the termination recommendation.

emphasized evidence that he had been replaced by a white machinist.

After hearing the evidence, the jury found that race was a motivating factor in Baker Hughes' decision to discharge Williams and that Baker Hughes would not have discharged Williams in the absence of this impermissible motivating factor. The jury awarded Williams back-pay of $145,000 and compensatory damages of $300,000.

## Standard of Review

 We will sustain a legal sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005). "More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 552 (Tex.2004). In conducting a legal sufficiency review, a court must consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it, and "[a] reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *City of Keller,* 168 S.W.3d at 822. However, a fact finder may not, from meager circumstantial evidence, reasonably infer an ultimate fact, none more probable than another. *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 392 (Tex. 1997). This Court has explained that un-

der the law of evidence, the term "inference" means "a truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved." *Marshall Field Stores, Inc. v. Gardiner,* 859 S.W.2d 391, 400 (Tex. App.-Houston [1st Dist.] 1993, writ dism'd w.o.j.) (quoting BLACK'S LAW DICTIONARY 700 (5th ed. 1979)). Thus, to "infer" a fact, one "must be able to deduce that fact as a logical consequence from other proven facts" and there must be a logical and rational connection between the facts in evidence and the fact to be inferred. *United States v. Michelena–Orovio,* 702 F.2d 496, 504 (5th Cir.), aff'd on reh'g, 719 F.2d 738 (5th Cir.1983) (en banc). Moreover, "[e]ven though the evidence is viewed in the light most favorable to the verdict, it cannot be considered in isolated bits and pieces divorced from its surroundings; it must be viewed in its proper context with other evidence." *AutoZone, Inc. v. Reyes,* 272 S.W.3d 588, 592 (Tex.2008) (citing *City of Keller,* 168 S.W.3d at 827). " '[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.' " *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004) (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983)).

## Motivating Factor

 In its first issue, Baker Hughes argues that the evidence is legally insufficient to support the jury's finding that race was a motivating factor in its decision to terminate Williams's employment because Williams admitted to violating an important manufacturing procedure, which was the reason for the termination; admitted that he deserved to be disciplined for

this potentially "dangerous" and "expensive" violation; and failed to present any proof of disparate treatment or any other evidence that race was a motivating factor in Baker Hughes' decision to terminate his employment. In response, Williams argues that the evidence is legally sufficient to support the jury's verdict because he "substantially complied" with the pertinent manufacturing procedure, Fendley and Schulz terminated the employment of "all" of the black machinists in the fishing tools section, Williams had "received harsher discipline than non-black employees," two non-black employees who committed similar transgressions had their employment terminated only after having received previous warnings, Baker Hughes' reasons for terminating Williams's employment "wobbled" and were "rife with exaggerations," and Baker Hughes had not informed employees that a violation of the M01.090 procedure could result in the termination of employment.

 Under the Act, an employer may not discriminate against or discharge an employee based on "race, color, disability, religion, sex, national origin, or age." TEX. LAB.CODE ANN. § 21.051 (Vernon 2006). "By adopting the Act, the Legislature intended to correlate state law with federal law in employment discrimination cases." *AutoZone, Inc.*, 272 S.W.3d at 592 (citing *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex.2005)); *Wal–Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex.2003). Therefore, we consider both federal and state law in interpreting the Act's provisions. *Id.; Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex.2001). To establish a violation of the Act, a plaintiff must show that he or she was (1) a member of a class protected by the Act, (2) qualified for his or her employment position, (3) terminated by the employer, and (4) treated less favorably

than similarly situated members of the opposing class. *AutoZone, Inc.*, 272 S.W.3d at 592; *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000). Here, Williams bore the burden of proving that race was a motivating factor in Baker Hughes' decision to terminate his employment. *AutoZone, Inc.*, 272 S.W.3d at 592.

Williams stresses that "[p]roving the employer's stated reason for the firing is pretext is ordinarily sufficient to permit the trier of fact to find that the employer was actually motivated by discrimination." *See Quantum Chem. Corp.*, 47 S.W.3d at 481–82. Williams also stresses that "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *See Reeves*, 530 U.S. at 147–148, 120 S.Ct. at 2108–09.

 In *Reeves*, the United States Supreme Court explained that "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination," which "may be quite persuasive" and, "*[i]n appropriate circumstances*, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.* at 147, 120 S.Ct. at 2108 (emphasis added). Thus, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may permit* the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148, 120 S.Ct. at 2109 (emphasis added). However, the Supreme Court cited with approval its prior holdings that "[i]t is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* at 147, 120 S.Ct. at 2108 (citing *St. Mary's Honor Ctr.*

*v. Hicks*, 509 U.S. 502, 519, 113 S.Ct. 2742, 2754, 125 L.Ed.2d 407 (1993)). Moreover, the Supreme Court rejected the suggestion that a showing of falsity by the plaintiff would *"always* be adequate to sustain a jury's finding of liability," and it recognized that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.* at 148, 120 S.Ct. at 2109. For example, "an employer would be entitled to judgment as a matter of law . . . if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.; see also Little v. Tex. Dep't of Criminal Justice*, 177 S.W.3d 624, 632 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (reviewing *Reeves* and stating that Supreme Court "has made it clear that it is not sufficient merely to show that the employer's reasons are false or not credible; the plaintiff must prove that the employer discriminated intentionally"). Accordingly, "[w]hether judgment as a matter of law is appropriate in any particular case will depend on a number of factors," including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves*, 530 U.S. at 148–149, 120 S.Ct. at 2109.

■ The Texas Supreme Court has cited, and followed, the principles set out in *Reeves. See AutoZone, Inc.*, 272 S.W.3d 588; *Ysleta Indep. Sch. Dist.*, 177 S.W.3d 915; *Canchola*, 121 S.W.3d 735; *Quantum Chem. Corp.*, 47 S.W.3d 473. Citing to

*Reeves*, the Texas Supreme Court has made clear that a plaintiff seeking to recover under the Act for illegal discrimination in a case involving an allegation of pretext must show both that the reason proffered by the employer is " 'false, *and* that discrimination was the real reason.' " *Canchola*, 121 S.W.3d at 740 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515, 113 S.Ct. at 2752). That is, in a racial discrimination case brought under the Act, even if the evidence could be sufficient to support an implied finding that the reasons cited by the employer for the employee's termination are false, the employee still bears "the ultimate burden" to prove that the employer discriminated against him because of race. *See id.* (citing *Reeves*, 530 U.S. at 147–49, 120 S.Ct. at 2097). Thus, "[t]he relevant inquiry" is not whether the stated basis for termination is a pretext, but what the stated basis was "a pretext *for." Id.*

We now turn to the evidence cited by Williams in support of his argument that the jury could have believed that Baker Hughes' stated reason for the termination of his employment was false and, based upon this falsity, could have reasonably inferred discrimination. First, Williams asserts that there is evidence that he substantially complied with the M01.090 procedure, which required machinists, like Williams, to report any nonconforming products that they detected to their supervisor. However, as noted above, Williams himself admitted that he had violated the M01.090 procedure when, after discovering that he had milled a nonconforming part, he notified another coworker machinist, rather than a supervisor, and then milled a second part from scrap material that he obtained in a non-controlled environment. It is undisputed that the tool Williams subsequently manufactured failed a hardness test because it was made with inferior material that was only one-third to one-

half of the hardness required by the specifications. Furthermore, Williams's testimony conclusively establishes that he knew the identity of his supervisors and that he knew Banda was not a supervisor. Although Williams, at trial, did testify that the term "supervisor" was not defined in the M01.090 procedure, he unequivocally stated that "everyone knew" that Banda was not a supervisor. Although Williams characterized Banda as a "leadman" to "a degree," there is no evidence that Banda was a supervisor.

Williams also admitted that his conduct, and his violation of the M01.090 procedure, could have had "expensive" and "dangerous" consequences, but for the fact that the defective part was discovered in Baker Hughes' inspection process. Williams also agreed that he deserved to be disciplined for his conduct, although he disputed the level of discipline ultimately imposed. Moreover, the undisputed evidence in the record also shows that no employee at the Baker Hughes' facility had been found to have violated the M01.090 procedure but had not been terminated. In sum, even though Williams presented evidence that might allow a juror to reasonably conclude that he, in good faith, had asked Banda how to proceed after he had discovered that he had made a nonconforming part and that other machinists at the Baker Hughes facility viewed Banda as an "unknown leadman" or a "troubleshooter," there is no evidence that would have allowed a juror to reasonably conclude that Williams substantially complied with the M01.090 procedure. Williams's admissions that he violated the M01.090 procedure and deserved to be disciplined for the potentially dangerous and expensive conse-

quence of the violation is conclusive on the issue of compliance.

Second, Williams asserts that Baker Hughes' reason for terminating his employment "wobbled throughout the case." Williams argues that Fendley's testimony was contradictory because he first testified that Baker Hughes terminated Williams's employment for failing to report a nonconforming part, but later testified that his employment was terminated for milling a second part out of inferior, non-controlled replacement material that subsequently failed an inspection for hardness. Contrary to Williams's assertion, Fendley's testimony is not at all inconsistent, and no reasonable juror could find these explanations to constitute "inconsistent justifications." The testimony was clear throughout the trial that Baker Hughes had not terminated Williams's employment simply because he milled a nonconforming part. In fact, the evidence showed that Williams, and numerous other machinists, had milled nonconforming parts in the past and their employment had not been terminated. Rather, the evidence was consistent that Baker Hughes terminated Williams's employment because he violated the M01.090 procedure by failing to notify his supervisors once he discovered the nonconforming part and then milling a second replacement part out of inferior material. Although Williams presented evidence that he disagreed with the decision to terminate his employment, the evidence reveals no legitimate discrepancies as to Baker Hughes' stated reason for his termination. At trial, Baker Hughes' stated reasons for the termination of Williams's employment were consistent with the reasons detailed in the discipline report, which Williams agrees he reviewed and signed on the date of the termination of his employment.[4]

---

4. In further effort to support his argument that Baker Hughes offered inconsistent reasons for terminating his employment,

Williams cites to a portion of a Baker Hughes personnel status form in which it is noted that Williams was "discharged-performance."

Third, Williams asserts that Baker Hughes' stated reason for termination of his employment was not expressly disclosed in any of the written policies and Baker Hughes did not comply with its own policies in terminating his employment. Williams cites an exhibit that identifies certain "dischargeable offenses" and notes that the list is "quite extensive." [5] Williams also cites an exhibit that sets forth disciplinary guidelines when machinists manufacture nonconforming parts. Williams emphasizes that the exhibit identifying the dischargeable offenses does not "say or hint that an employee who fails to report a nonconformance to a supervisor or makes a nonconforming part that is discovered during inspection may result in immediate termination." Williams also notes that the written M01.090 procedure did not state that noncompliance would result in termination, and he cites his testimony that he and other machinists had made nonconforming parts in the past and had not had their employment terminated. However, the referenced exhibit makes clear that the list of dischargeable offenses is not exhaustive and it notes that "serious violations that may result in an employee's immediate discharge may include, but are not limited to" the enumerated offenses. In fact, expressly included in the list of terminable offenses is "any serious breach" of Baker Hughes' policies, rules, or regulations. Baker Hughes also reserved the right to terminate employment for serious breaches in other general employment documents introduced into evidence. We again note that Williams himself testified that his procedural violation and his conduct in manufacturing a milled part from scavenged material could have led to a "dangerous" and "expensive" tool failure had the defective part not been discovered by others subsequently in the inspection process.

Additionally, Williams misses the point when he cites to evidence that Baker Hughes had not, in the past, discharged employees merely for manufacturing nonconforming parts and had furnished disciplinary guidelines that did not require immediate discharge of employees who manufacture nonconforming parts. This is because, as set forth above, Baker Hughes' consistently stated reason for the termination of Williams's employment was not the mere manufacturing of a nonconforming part. Williams did not simply mill a nonconforming part, which machinists had done in the past without having their employment terminated. Rather, he had discovered that he had made a nonconforming part and then had attempted to mill a replacement part with inferior, scavenged material without notifying his supervisor in violation of the M01.090 procedure.

Fourth, Williams asserts that Baker Hughes exaggerated the potential consequences that could have occurred if the replacement part manufactured by Williams had not been discovered in in-

Williams emphasizes this statement because Fendley and Schulz both agreed that Williams had otherwise been a good employee and Fendley further agreed that Williams's employment was not technically terminated for "performance," but because of the severe and serious procedural violation in question. However, in the comments section of this form, it clearly states, "Employee discharged because of ISO violation." Based upon this, no reasonable juror could have concluded from the "performance" entry in this personnel form that Baker Hughes had offered inconsistent justifications for its termination of Williams's employment.

5. This list identifies dischargeable offenses to include, among other things, making false statements on an employment application, willful destruction of property, theft, falsifying time records, harassment, divulging confidential information, and insubordination.

spection and, thus, the jury could have inferred racial discrimination. However, despite Williams's characterizations at trial that Baker Hughes had grossly inflated the consequences that could have resulted if the defective product had made it to an end user, the testimony provided by Fendley, Schulz, and Self was consistent with Williams's own admissions that there could have been "expensive" and "dangerous" consequences. Fendley and Schulz generally testified that Williams's conduct presented a "severe" and "serious" violation that could have resulted in tool failure and could have had "safety" and "environmental" implications. Here, the fact that Baker Hughes did not furnish more detailed evidence regarding the potential specific consequences would not have enabled a reasonable juror to conclude that Baker Hughes' reason for terminating Williams's employment was false and, thus, to infer that Baker Hughes' real reason for the termination was racial discrimination. In sum, none of Williams's asserted concerns would allow a juror to reasonably conclude that Baker Hughes' reason for terminating Williams's employment was false and was a pretext for racial discrimination.

Williams next asserts that racial discrimination can be inferred based upon evidence that Fendley and Schulz terminated the employment of "all" the other black machinists in the fishing tools section during, or shortly after, Williams's tenure in the section. At trial, Williams opined that five other black machinists in the fishing tools section had been termi-nated by Fendley or Schulz: Al Daigle, Jesse Ross, Andre White, Harold DeWalt, and Wesley Dickie. First, there is no direct evidence that the employment of these men was terminated for discriminatory reasons. In fact, there is nothing in the record to show that any of these men ever alleged or believed that their employment was terminated for discriminatory reasons. Neither side chose to call any of these men to testify, and Williams did not introduce any evidence as to why their employment was terminated or whether they would have agreed or disagreed with Baker Hughes' reason for its decision, if any, to terminate their employment. In fact, on cross-examination, Williams conceded that he had no idea as to whether Baker Hughes had legitimate nondiscriminatory reasons to terminate the employment of these machinists.

In response to Williams's stated belief as to why Baker Hughes had terminated the employment of these machinists, Baker Hughes introduced evidence that it had not terminated Dickie's employment and he had actually resigned at some point after Williams's employment had been terminated, it had terminated DeWalt's employment because he had violated Baker Hughes' attendance policy, it had terminated (for a second time) White's employment because of excessive absenteeism, it had terminated Ross's employment because of issues regarding the quality of his work, and it had terminated Daigle's employment because he had committed various infractions.[6]

---

**6.** Baker Hughes also introduced evidence that Fendley and Schulz had discharged numerous other white and Hispanic employees under their supervision in the fishing tools section. Even Williams agreed that he was aware that Schulz and Fendley had also fired at least two white employees in the fishing tools section during his tenure. Additionally, Baker Hughes introduced evidence that Fendley and Schulz supervised numerous other black employees in the fishing tools section. Fendley testified that he and Schulz supervised at least eleven other black employees in the fishing tools section, including one machinist, several of the black employees had been promoted, and he had hired at least one black employee specifically for the fishing tools section during the pendency of the lawsuit. Fendley ex-

Williams further asserts that racial discrimination can be inferred based upon evidence that he received harsher discipline than non-black employees. "To prove discrimination based on disparate discipline, 'the disciplined and undisciplined employees' misconduct must be of 'comparable seriousness.'" *AutoZone, Inc.*, 272 S.W.3d at 594 (citing *Ysleta Indep. Sch. Dist.*, 177 S.W.3d at 917). "The situations and conduct of the employees in question must be 'nearly identical.'" *Id.* (citing *Ysleta Indep. Sch. Dist.*, 177 S.W.3d at 917); *see also Winters v. Chubb & Son, Inc.*, 132 S.W.3d 568, 578 (Tex.App.-Houston [14th Dist.] 2004, no pet.); *Kelley v. Humble Indep. Sch. Dist.*, No. 01–05–00761–CV, 2007 WL 926505, at *8 (Tex. App.-Houston [1st Dist.] Mar. 29, 2007, pet. denied) (mem. op.). "Employees with different responsibilities, supervisors, capabilities, work rule violations, or disciplinary records are not considered to be 'nearly identical.'" *AutoZone, Inc.*, 272 S.W.3d at 594 (citing *Ysleta Indep. Sch. Dist.*, 177 S.W.3d at 917). "The situations and conduct of employees is not nearly identical 'when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer.'" *Id.* (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001)).

In support of his claim of disparate treatment, Williams initially relies upon a comparison with Danny Houge, a white welder supervised by Fendley. At trial, Williams introduced two disciplinary reports regarding Houge. In the first report, Houge was disciplined for violating shop procedure M01.050 by failing to identify correct parts before welding, which required the parts to be reworked and resulted in a "disruption in the work process," and for performing a weld that was not in compliance with weld procedures, and Houge received a two day suspension for these violations. In the second report, Houge was again disciplined for violating shop procedure M01.050, and he received a two-day suspension. Williams argues that both he and Houge were found to have violated "similar operating procedures," and, thus, "the jury was allowed to infer that because [Williams] received a harsher penalty for a comparable offense than non-black employees committed, discrimination was a reason for the disparity."

Williams also cites to evidence related to nine other non-black employees supervised by Fendley or Schulz who Williams contends received less severe discipline after committing conduct of "comparable seriousness." Williams cites evidence that (1) Eliborio Villegas was suspended for three days for failing to thoroughly inspect his work, resulting in the parts that he had manufactured being scrapped upon inspection, (2) Richard Benitez was suspended for two days for disregarding "core values" and supplying false information on a company record and to a member of management, (3) Donny Doung was suspended for three days for disregarding core values for working on a day without supervisor approval, (4) Manuel Montanez was suspended for three days for violating procedure M01.050 by failing to place identifying numbers on parts that he had manufactured, (5) Huan Hong was suspended for two days for violating manufacturing procedure M01.050 by failing to stamp machined parts with his personal stamp re-

plained that many of these employees had been employed in the fishing tools section since he was appointed supervisor. Schulz also testified that both he and Fendley super-

vised numerous other black employees who remained employed at the Baker Hughes facility.

sulting in parts being scrapped, (6) Jose Lopez was suspended for two days for "failure to have first article inspection on multiple pc," (7) Joe Vidaurri was suspended for two days for violating shop procedures by failing to get a first article inspection resulting in scrapped parts, (8) Taun Tran was suspended for a safety violation for removing a "tag out" tag from a machine when he was not authorized to do so, and (9) Archie Venezuela received a written warning for violating unspecified shop procedures.

However, none of Williams's evidence concerning the disciplinary treatment of the other non-black employees involved conduct comparable to that committed by Williams. Specifically, none of the above employees were charged with violating procedure M01.090 by failing to notify their supervisor upon detecting a nonconforming part and none were found to have milled a replacement part from non-controlled material of inferior quality.

Williams further relies upon Baker Hughes' evidence concerning its termination of the employment of a white machinist, Michael Dillon, and a Hispanic machinist, Nicolas Escutia, both of whom did not work in the fishing tools section, but who had also violated the M01.090 procedure. Williams argues that the jury could have reasonably inferred that Baker Hughes' stated reason for the termination of his employment was "not worthy of credence" because it "applied a different decision-making standard" to Dillon and Escutia. Referencing Baker Hughes' form Discipline Report regarding Dillon, Williams asserts that Dillon, unlike himself, was "given oral and written reprimands, and a suspension" before Baker Hughes terminated his employment. Referencing Baker Hughes' form Discipline Report regarding Escutia, Williams asserts that Baker Hughes terminated Escu-

tia's employment "after he twice, not once violated the same policy for which [Williams's] employment was terminated." He argues that Escutia's situation was "exceedingly more egregious" "because he sought to hide scraps in addition to failing to report them."

A review of the Baker Hughes Discipline Report concerning Dillon does reveal that prior to the termination of his employment on April 27, 2003, he had received on "Feb. 22, week of Feb. 15th (Feb. 03)," oral and written warnings and a suspension by Raymond Clotter. Also, a review of the Baker Hughes Discipline Report concerning Escutia does reveal that prior to the termination of his employment on June 13, 2004, he had received on June 7, 2004, a written warning by Jerry Vickery. However, as pointed out by Baker Hughes, neither Discipline Report explains why or for what infractions Dillon and Escutia had received previous warnings. And neither party presented testimony to explain the information contained in the reports. In fact, although it is not disputed that Williams had not previously violated the M01.090 procedure, the Baker Hughes Discipline Report regarding the termination of his employment reveals that Williams had received a previous warning from Fendley for an infraction. Without evidence explaining why and for what infractions Dillon and Escutia had "received previous warnings," we conclude that the jury, from the reports in evidence, could not have rationally inferred that Baker Hughes applied a different disciplinary standard to Dillon and Escutia than it applied to Williams. Again, the term "inference" means "a truth or proposition drawn from another which is supposed or admitted to be true" and "[a] process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved." *Marshall*

*Field Stores, Inc.*, 859 S.W.2d at 400. Moreover, Baker Hughes introduced evidence that Williams's conduct could have resulted in tool failure, which even Williams admits could have had "dangerous" and "expensive" consequences if the defect had not been discovered in inspection.

In sum, the evidence regarding the conduct and circumstances of Williams and the non-black employees referenced above does not rise to the level that, when viewed in the light most favorable to the judgment, a reasonable jury could find that the conduct or the circumstances surrounding the conduct were "nearly identical" for the purposes of establishing discrimination based upon disparate discipline.[7] *Auto-Zone, Inc.*, 272 S.W.3d at 594; *see also Ysleta Indep. Sch. Dist.*, 177 S.W.3d at 917–18 (finding no evidence that misconduct was of "comparable seriousness"); *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478–79 (5th Cir.2005) ("no reasonable jury could conclude that the two events are 'nearly identical' ").

Finally, Williams argues that the jury could have reasonably inferred that race was a motivating factor in Baker Hughes' decision to terminate his employment because "turnover among black employees" at the Baker Hughes facility was high or higher and Fendley's and Schulz's hiring practices suggested discrimination. In support of his assertion that turnover was higher among black employees, Williams cites a chart, which was prepared by Baker Hughes in response to an interrogatory, detailing the race of all employees that Baker Hughes had employed in the fishing tools section from January 1, 2000. Of the 118 employees identified by Baker Hughes, eighteen were black. In addition to his general complaint regarding the lack of diversity in the workforce, Williams notes that the Baker Hughes chart reflects that, of the seven employees whose employment was terminated for performance, four were black, two were Hispanic, and one was white. Williams also states, without any explanation, that Baker Hughes' fifty-six person management team was all white at the time that his employment was terminated. Moreover, Williams suggests that because Fendley testified at trial that he had not hired any black employees prior to his deposition but that he had hired a black employee after his deposition, a jury could have inferred that this post-deposition hiring was simply "window dressing" to cover up discriminatory hiring practices by Fendley and Schulz.

■ However, as noted above, the only evidence in the record as to why the employment of the four or five other black machinists ended was provided by Baker Hughes. There is no evidence, nor is there even an allegation from someone other than Williams, that the employment of these machinists ended because of racial discrimination. Williams himself admitted that he lacked personal knowledge as to how the employment of these machinists ended. Although Williams opined that these other black machinists were "eradicated" out of the fishing tools section, "[a]n employee's own subjective belief of discrimination, no matter how genuine, cannot serve as the basis for judicial relief." *Winters*, 132 S.W.3d at 576. Baker Hughes was the only party to introduce evidence as to why the employment of these other machinists ended, and Baker Hughes introduced evidence that the employment of a number of non-black employees who had worked under the super-

---

7. We also note that many of the discipline reports concerning the non-black employees cited by Williams reflect that different decision-makers were involved in the termination of many of these employees.

vision of Schulz and Fendley had been terminated for a variety of reasons, including poor performance. Additionally, there is no evidence in the record concerning the diversity of the applicant pool for the Baker Hughes positions over which Fendley had hiring authority, so the jury would not have been entitled to draw any inferences from the fact that Fendley testified that he had not hired a black worker prior to his deposition.

■ Moreover, there is no evidence as to how many hiring decisions Fendley had himself made during this period, and Fendley testified that, other than certain specialities for which he had hired, the remaining hiring decisions were made by a Baker Hughes hiring manager.[8] This hiring manager did not testify, and there is no evidence distinguishing between hiring decisions made by Fendley and those made by others at Baker Hughes. Finally, based upon the record before us, we note that no reasonable juror could infer that Baker Hughes was motivated by race in terminating Williams's employment based upon evidence that Fendley had hired a black employee during the pendency of Williams's lawsuit. We recognize that statistical evidence may be relevant in evaluating claims of racial discrimination in some cases. *See Quantum Chem. Corp.*, 47 S.W.3d at 482; *DeCorte v. Jordan*, 497 F.3d 433, 439 (5th Cir.2007). Here, however, we conclude that, to the extent the evidence submitted by Williams can even be considered statistical evidence, the bare evidence that four of the seven machinists in the fishing tools section who were terminated for performance reasons were black cannot support Williams's claim of racial discrimination. *See Baker v. Randstad North America, L.P.*, 151 Fed.

Appx. 314, 320 (5th Cir.2005) (stating that "[a]lthough statistical evidence can be probative of pretext, it is extraordinarily rare that raw numbers can insulate a plaintiff from summary judgment" and that "[t]he probative value of statistical evidence ultimately depends on all the surrounding facts, circumstances, and other evidence of discrimination."). In sum, a juror, in the absence of any other probative evidence of racial discrimination, could not draw a reasonable inference of racial discrimination based upon the limited record pertaining to these other black machinists.

Accordingly, we hold that the evidence is legally insufficient to support the jury's finding that race was a motivating factor in Baker Hughes' termination of Williams's employment.

We sustain Baker Hughes' first issue.

### Conclusion

Having held that the evidence is legally insufficient to support the jury's verdict, we need not consider Baker Hughes' remaining issues. We reverse the judgment of the trial court and render a take nothing judgment in favor of Baker Hughes.

Justice SHARP, dissenting.

JIM SHARP, Justice, dissenting.

Pretext discrimination cases inherently involve a question of credibility because they require the determination of whether the stated reason for the adverse action is true or false-in other words, "the defendant's mens rea." "Whether the defendant was in fact motivated by discrimination is of course for the finder of fact to decide[.]" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 154, 120 S.Ct.

---

**8.** Fendley testified that he had hired employees who worked on welding, grinding, and heat operators, and that he had also hired some employees at job fairs, but that a hiring manager hired all other employees.

2097, 2112, 147 L.Ed.2d 105 (2000) (Ginsburg, J., concurring). For this reason, a jury verdict in a pretext discrimination case should rarely be overturned. *See id.* at 155, 120 S.Ct. at 2112 (absent conclusive determination that discrimination could not be true motivation, "the ultimate question of liability ordinarily should not be taken from the jury" once plaintiff has introduced evidence establishing prima facie case and evidence that employer's proffered explanation for adverse action was false).

Appellate courts have nothing but written words on a page. A jury has the opportunity to hear the tone, inflection, hesitation, or assuredness of the witnesses. It can evaluate the witnesses' expressions, gestures, mannerisms, and attitudes. It can sense nervousness, arrogance, honesty, and deception. In short, it can do what we cannot-determine when someone is lying.

In this case, Mr. Williams was required to prove two things to the jury: (1) the stated reason for his termination was a pretext (i.e., not the true reason) and (2) the true reason was discrimination. The jury, after hearing all the witnesses and reviewing all the evidence, simply "did not believe the Baker Hughes witnesses," and found that the alleged basis for Williams's termination was not the real reason he was discharged. Rather, the jury found that discrimination was the real reason behind Williams's termination.

In reversing that jury verdict, the majority found that there was no evidence supporting the jury's determination that race was a motivating factor in Baker Hughes decision to fire Williams. But there was evidence at trial, viewed in the light most favorable to the verdict, that (1) Baker Hughes acquiesced in the "common practice" of the machinists reporting problems to Moises Banda, (2) other black machinists in the Fishing Tools department who—prior to Fendley's and Schulz's supervision—had good work records, were subjected to increased performance citations after Fendley and Schulz became supervisors, and five were eventually terminated,[1] (3) the termination rate of black employees at Baker Hughes' Fishing Tools section for performance issues was higher than that of white or Hispanic employees, and (4) Williams was replaced by a white employee. The "aggregate effect of all these pieces" of evidence amounts to at least sufficient evidence to rise "to a level that would enable reasonable and fair-minded people to differ in their conclusions" about whether race was a motivating factor in Williams's termination. *See King Ranch v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003) (defining when "more than a scintilla of evidence" exists).

The "jury heard all the evidence in context and reached a permissible conclusion about what happened" and there is more than a scintilla of evidence supporting their conclusion. The evidence is therefore legally sufficient to support the verdict. Because the majority has held otherwise, I dissent.

---

1. There was testimony that one worker resigned, but the jury, as fact finder, was free to disbelieve this testimony.