

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-25-00053-CV

**R CONSTRUCTION COMPANY**,
Appellant

v.

Lavorgus **CANADY**,
Appellee

From the 218th Judicial District Court, Wilson County, Texas
Trial Court No. CVW2100490
Honorable Jennifer Dillingham, Judge Presiding

Opinion by:    Irene Rios, Justice

Sitting:       Irene Rios, Justice
               Lori Massey Brissette, Justice
               Adrian A. Spears II, Justice

Delivered and Filed: May 27, 2026

AFFIRMED IN PART; REVERSED AND RENDERED IN PART

A jury found appellant R Construction terminated appellee Lavorgus Canady's employment in retaliation for Canady's opposition to racial discrimination under the Texas Commission on Human Rights Act ("TCHRA"). In its first nine issues, which we construe as a single issue, R Construction contends the evidence is legally insufficient to support the jury's retaliation finding. In its tenth and eleventh issues, R Construction argues Canady is not permitted to recover back pay under the TCHRA unless it is accompanied with other equitable relief. In its

twelfth issue, R Construction argues the evidence is legally and factually insufficient to support the award of back pay. In its thirteenth through fifteenth issues, R Construction argues the evidence is legally and factually insufficient to support past and future compensatory damages. In its sixteenth issue, R Construction argues the evidence is legally and factually insufficient to support the award for punitive damages. In its seventeenth issue, R Construction challenges the award of attorney's fees.

We hold the evidence is legally sufficient to support the jury's finding that Canady was terminated in retaliation for opposing a discriminatory practice and Canady was entitled to recover back pay. We hold the evidence was legally and factually sufficient to support the awards for back pay, past compensatory damages, and punitive damages. However, we hold the evidence is legally insufficient to support the award for future compensatory damages. Accordingly, we reverse the portion of the trial court's final judgment awarding future compensatory damages. In all other respects, we affirm the trial court's judgment.

## BACKGROUND

R Construction is a company that services oil rigs. Canady began working for R Construction in November 2018 as a roustabout, which is a general laborer that may be asked to perform a wide range of duties as assigned to service customer's oil rigs. Eventually Canady was promoted as a leader of a crew of roustabouts.

EOG Resources, Inc. ("EOG") was one of R Construction's customers. The testimony indicates that EOG was a big customer and R Construction did a lot of work for it. In March 2019, Canady and his crew were assigned to service an EOG oil rig. Canady and the members of his crew were all African American and they were all riding in the truck Canady was driving to the jobsite. When Canady and the crew arrived at the EOG oil rig, Canady rolled down his truck

window to speak with EOG's mud engineer on the rig. During that conversation EOG's mud engineer told him: "I guess your boss didn't tell you guys I thought that you guys wouldn't make it past the KKK." Canady replied, "Excuse me?" EOG's mud engineer then repeated his comment. Canady then rolled up his window and called his supervisor, Dustin Meyer. When Meyer did not answer, Canady told a member of his crew: "Bro, I can't take it. I'm not going to do it. I refuse to."

Canady began driving the crew back to R Construction's yard and called "the next higher up" person at the company, Nathan. According to Canady, when he told Nathan what occurred, Nathan chuckled and said: "I can't believe the guy said that, but I'll look into it." When Canady arrived at R Construction's shop, Meyer invited him into the office to talk. Canady testified Meyer told him to stand down and teach Josh Manley, a white employee, Canady's job so that he could pose as the supervisor for the EOG mud engineer because R Construction needed to finish the job.[1] Manley had only been on the job for approximately a month and didn't have the specialized experience and skills for the job that Canady possessed; nevertheless, Manley was instructed to see if the EOG mud engineer had a problem with R Construction in general or if he had a concern with an African American crew. According to Canady, Manley reported to Meyer that the EOG mud engineer was "kind of fishy" and Canady was instructed by Meyer to leave the job site. Canady testified he went home and cried.

The next day, Meyer told Canady that he would take care of the issue regarding the EOG mud engineer's remarks made the previous day. Two weeks later, Canady was dispatched to a different job site where the same EOG mud engineer was working. When Canady discovered the mud engineer who made the KKK remarks was at the site, he left the job and returned to R

---

[1] Canady testified: "[Meyer] told me to take Josh Manley back with me, to stand down and to show Josh my job, that we needed to finish the job and we wanted to figure out [if the EOG mud engineer was] really being a butt or not."

Construction's yard. EOG reported that Canady's crew left the site. When the crew returned to the yard, Nathan pulled Canady aside and asked Canady what he expected Nathan to do. Canady replied: "Do something. . . . [P]ush it to the top." Nathan told Canady if he pushes Canady's complaint any further, then R Construction will be losing business with EOG. Canady told Nathan he did not care and did not want to work with the EOG mud engineer. Nathan said he would see what he could do.

In the months after Canady reported the EOG mud engineer's KKK remarks, he was subjected to drug testing and was subjected to disciplinary actions for alleged work violations. Prior to Canady reporting the KKK remarks, he had never received a reprimand for work violations. Meyer fired Canady after the third reprimand. Canady sued R Construction alleging Meyer issued the reprimands as a pretext to fire him in retaliation for opposing the EOG mud engineer's comments, which he believed to be discriminatory and racially harassing.

At trial, R Construction argued Canady was fired because he violated company policy three different times and caused R Construction to lose a client. Canady, of course, argued he was the victim of retaliatory discharge. A jury found in favor of Canady and awarded him $415,000 in back pay, $100,000 in compensatory damages, $50,000 in future compensatory damages, and $750,000 in punitive damages. The trial court remitted the punitive damages to $50,000 in accordance with the statutory cap, awarded attorney's fees in the amount of $55,297.50, and adopted the remaining damages awarded by the jury in its final judgment.

R Construction filed a motion for judgment notwithstanding the verdict arguing there is insufficient evidence to support the jury's findings. The motion was overruled by operation of law. R Construction appeals.

**SUFFICIENCY OF THE EVIDENCE TO SUPPORT RETALIATION CLAIM**

Canady brought a retaliation claim under section 21.055 of the Texas Commission on Human Rights Act ("TCHRA"). *See* TEX. LABOR CODE ANN. § 21.055. Under that provision of the TCHRA, an employer commits an unlawful employment practice if the employer retaliates or discriminates against a person who opposes a discriminatory practice. *See id.* Canady asserted at trial that he was terminated by R Construction because he reported racially discriminatory remarks made by EOG's mud engineer. To the question of whether R Construction discharged Canady because of his opposition to a discriminatory practice, the jury answered: "Yes."

R Construction presents nine different arguments across its first nine issues supporting its contention that it did not engage in discriminatory practices and did not terminate Canady in retaliation for reporting or opposing the KKK comments made by the EOG mud engineer. Several of R Construction's issues focus on elements of the *McDonnell Douglas* burden-shifting framework to show a prima facie case of retaliation under the TCHRA.[2] However, that analysis is only appropriate when the case has not yet been fully tried on the merits. *See Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003) ("In discrimination cases that have not been fully tried on the merits, we apply the burden-shifting analysis established by the United States Supreme Court." (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973))). "But when a discrimination case has been fully tried on its merits, as in this case, a reviewing court does not engage in a burden-shifting analysis." *Canchola*, 121 S.W.3d at 739. "Instead, we inquire

---

[2] R Construction also argues the one "offhand" comment by the EOG mud engineer is not protected activity under the TCHRA. But the protected activity was not being subjected to the KKK comment. The protected activity was Canady's opposition to the comment. *See San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 137 (Tex. 2015) ("Opposition to a discriminatory practice is a protected activity irrespective of the merits of the underlying discrimination claim."). "However, to establish an employee opposed a discriminatory practice, the employee must demonstrate a good-faith, reasonable belief that the underlying discriminatory practice violated the TCHRA." *Id.* Here, the record clearly shows that Canady was upset by the KKK comments, he immediately reported it to R Construction's management, and Canady repeatedly pressed the issue when he did not see R Construction address it. Clearly, Canady had a good-faith, reasonable belief that the KKK comment violated the TCHRA.

whether the evidence is legally sufficient to support the jury's ultimate finding." *Id.*; *see also Pineda v. United Parcel Servs., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004) (internal quotation marks omitted) ("When there has been a trial on the merits, the evaluation process is streamlined and we proceed directly to the ultimate question of whether the plaintiff presented enough evidence for a jury to find that discrimination occurred.").[3]  Accordingly, we construe R Construction's first nine issues as a challenge to the legal sufficiency of the evidence to support the jury's verdict that R Construction terminated Canady in retaliation for reporting racially discriminatory conduct.[4]

When an appellant challenges the legal sufficiency of the evidence on an adverse finding for which the appellant did not have the burden of proof, the appellant must show no evidence exists to support the adverse findings. *Eagle Rock Timber, Inc. v. Rock Hard Rental, LLC*, 672 S.W.3d 438, 448 (Tex. App.—San Antonio 2023, pet. denied).  "We will sustain a legal sufficiency or 'no-evidence' challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact." *Baker Hughes Oilfield Operations, Inc. v. Williams*, 360 S.W.3d 15, 21 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005)). We view the evidence in the light most favorable to the finding, indulging every reasonable inference that would support it while disregarding all contrary evidence that a reasonable factfinder could have disbelieved.  *Eagle Rock Timber*, 672 S.W.3d at 448; *see also City of Keller*,

---

[3] One of TCHRA's purposes is to provide for the execution of the policies of Title VII of the Civil Rights Act of 1964. *See* TEX. LABOR CODE ANN. § 21.001(1); *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001). "Therefore, analogous federal statutes and the cases interpreting them guide our reading of the TCHRA." *Toennies*, 47 S.W.3d at 476.

[4] R Construction contends the evidence is insufficient as a matter of law.  We construe this as a legal sufficiency challenge.  Because R Construction does not assert a factual sufficiency challenge in its brief, we do not review the factual sufficiency of the evidence here.

168 S.W.3d at 822. "If there is more than a scintilla of evidence to support a finding, it must be upheld." *Eagle Rock Timber*, 672 S.W.3d at 448. However, "a jury 'may not, from meager circumstantial evidence, reasonably infer an ultimate fact, none more probable than another.'" *SCI Funeral Servs., LLC v. Moss*, No. 02-24-00182-CV, 2025 WL 876782, at *4 (Tex. App.—Fort Worth Mar. 20, 2025, pet. denied) (quoting *Williams*, 360 S.W.3d at 21). "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Williams*, 360 S.W.3d at 21 (alteration omitted).

A remedy for retaliation under TCHRA "only exists when the evidence establishes that a materially adverse employment action resulted from the employee's protected activity." *Boxer Prop. Mgmt. Corp. v. Dehnel*, No. 02-22-00336-CV, 2024 WL 3282541, at *22 (Tex. App.—Fort Worth July 3, 2024, pet. denied). "An employee claiming retaliation must prove that but for [his] protected conduct, [his] employer's prohibited conduct would not have occurred when it did." *See id.* (citing *Apache Corp. v. Davis*, 627 S.W.3d 324, 325 (Tex. 2021)).

At trial, it was Canady's burden to prove that he was terminated in retaliation for opposing racially discriminatory conduct at the EOG jobsite. Thus, the question here is whether the evidence is legally sufficient to support the jury's finding that but for Canady's opposition to and reporting of racially discriminatory conduct, R Construction would not have terminated Canady when it did. *See Davis*, 627 S.W.3d at 335, 337 (Tex. 2021); *see also Pineda*, 360 F.3d at 487 ("We have consistently held that in retaliation cases where the defendant has proffered a nondiscriminatory purpose for the adverse employment action[,] the plaintiff has the burden of proving that 'but for' the discriminatory purpose he would not have been terminated."). "The but-for causation standard prevents 'an employee who knows that []he is about to be fired for poor performance' from

profiting off of 'an unfounded charge of discrimination' made to protect [him]self from an unrelated employment action.'" *Davis*, 627 S.W.3d at 335–36 (alterations omitted) (quoting *Univ. of Tex. SW. Medical Ctr. v. Nassar*, 570 U.S. 338, 358 (2013)).

Although not meant to supplant the "but-for" standard, the supreme court has identified factors a reviewing court may consider when determining whether the circumstantial evidence supports a jury's verdict that but-for engaging in the protected activity, the plaintiff would not have been terminated. *Davis*, 627 S.W.3d at 336. Those factors, as modified for this case, include: (1) the temporal proximity between the protected activity and the adverse action; (2) knowledge of the protected activity by those making the decision on termination; (3) expression of a negative attitude toward the employee's engagement in the protected activity; (4) the employer's failure to adhere to established company policies; (5) discriminatory treatment in comparison to similarly situated employees; and (6) evidence that the stated reason for the discharge was false. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 790 (Tex. 2018); *Davis*, 627 S.W.3d at 326 n.3; *Dehnel*, 2024 WL 3282541, at *23.

"An adverse employment action based solely on reasons unrelated to the protected conduct destroys the causal link." *Dehnel*, 2024 WL 3282541, at *22 (citing *Davis*, 627 S.W.3d at 325). And when a defendant employer proffers a permissible explanation for the termination, the plaintiff must offer some evidence that permits the jury to infer that the defendant's proffered explanation for the plaintiff's termination was a pretext for retaliation. *Pineda*, 360 F.3d at 487. The jury "may not simply choose to disbelieve the employer's explanation in the absence of any evidence showing why it should do so." *Id.*; *see also Davis*, 627 S.W.3d at 335 ("In analyzing what the causal connection between protected activity and an unlawful response must be to establish liability under the [TCHRA], we [previously] reasoned that '[a]n employer who has

sufficient sound reasons for discharging an employee should not incur liability merely for disliking the employee for reporting illegal conduct when that dislike played no part in the disputed personnel actions.'" (quoting *Tex. Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629. 635 (Tex. 1995))). While this "but-for" causation standard "best protects employees from unlawful retaliation without punishing employers for legitimately sanctioning misconduct or harboring bad motive never acted upon," an employee is not required to prove that his protected activity "was the sole reason for his employer's adverse actions." *Davis*, 627 S.W.3d at 335 (acknowledging the but-for standard first presented in *Hinds* did not require an employee to prove that reporting an illegal activity under the Whistleblower Act was the sole reason for termination, and recognizing the same standard applies in cases alleging retaliation for opposing discriminatory practices under section 21.055 of the TCHRA).

"Further, an employer is not forbidden from addressing performance issues involving employees who have engaged in protected activity, including following through on known preexisting issues and addressing existing issues that come to light only during subsequent investigation." *Dehnel*, 2024 WL 3282541, at *23 (citing *Clark*, 544 S.W.3d at 791–92). The issue instead "is whether the employer's perception of the problems—accurate or not—was the real reason for termination." *Clark*, 544 S.W.3d at 792. "And context is critical in a legal-sufficiency review because 'the lack of supporting evidence may not appear until all the evidence is reviewed in context.'" *Dehnel*, 2024 WL 3282541, at *23 (quoting *Clark*, 544 S.W.3d at 793).

Here, Canady reported the EOG mud engineer's KKK remarks immediately, and he drove off the EOG jobsite returning to R Construction's yard. Canady discussed the issue with Meyer in his office with a few other members of R Construction's management team.[5] It is undisputed

---

[5] Although Canady did speak with Meyer when he returned to R Construction's yard, it is unclear whether the conversation involving other members of management occurred that day or the next day.

that Meyer sent Canady and his crew back to the EOG jobsite. However, this time, Canady testified he was ordered to "stand down" as the crew leader and let a less-experienced, new, white employee, Josh Manley, pose as the crew leader even though Manley had never been a crew leader before. Once Canady showed Manley what needed to be done, he left the EOG jobsite again. Canady testified Manley, who was previously a subordinate to Canady, was subsequently promoted to a position superior to Canady and was given a raise.[6] According to Canady, Manley was given his position as crew leader after Canady was fired. Canady's testimony regarding Manley was corroborated by Jeramee Strain, who was another member of Canady's crew.

Meyer acknowledged that R Construction's company policy was to investigate claims of discrimination or racial harassment and that the policy applied even if the discrimination or harassment came from vendors, customers, or clients. Meyer conceded he had an obligation to investigate the issue and to report it to the company's human resources department. When asked whether he reported the KKK remarks made by EOG's mud engineer to human resources, Meyer stated he could not recall. Meyer stated the claim was discussed with Canady and other members of management. According to Meyer, a member of the sales team was supposed to investigate the claim of racial harassment but Meyer was unaware that any formal investigation took place. Meyer also stated he was unaware of any report or documentation of the alleged investigation. Meyer conceded he never spoke with EOG or the mud engineer about the allegations of discrimination and racial harassment. Meyer acknowledged he had a duty to report the allegation to his superiors but stated Canady did not want to push the issue because he was worried R Construction would lose business and Canady was concerned about losing hours to work. Canady vehemently disputed Meyer's statement that Canady did not want to push the issue. Although Meyer testified he

---

[6] The evidence is disputed on whether Manley was given a temporary, supervisory job to help Meyer out for a month or whether it was a permanent promotion that was later taken away by the owner of the company.

interviewed members of Canady's crew to determine what happened, Brandon Moore, another member of Canady's crew, disputed this testimony stating he was never interviewed or questioned by Meyer or anyone else at R Construction regarding the incident.

The jury heard testimony that Canady complained to several different members of management that he felt like he was being singled-out and discriminated against after he complained about the KKK comment. Canady pointed to Meyer's order for him to stand down to Manley while he posed as the crew leader. Canady also pointed to Manley's promotion, albeit temporary, and testified that he told management that he thought he was being subjected to excessive drug testing and was targeted with disciplinary reprimands after he complained about the mud engineer's KKK remarks.

Finally, Canady testified that his hours working as a crew leader were significantly reduced after his complaint. Moore corroborated Canady's testimony stating he noticed Canady's hours were reduced after he reported the EOG mud engineer's KKK comments. The jury was presented with evidence showing Canady's hours fluctuated based on the jobs R Construction received from its customers and these fluctuations were reflected in Canady's timesheet before and after Canady complained about the KKK remarks.[7] R Construction presented evidence showing Canady's hours were not drastically reduced after the complaint. However, Canady testified he had to seek work from another manager within the company doing different work to maintain his hours because Meyer reduced Canady's workload as a roustabout after he opposed the EOG mud engineer's

---

[7] Canady's timesheet showing his weekly hours during the entire duration of his employment with R Construction was admitted into evidence. Canady's hours from mid-March 2018 through July 2018 shows Canady averaged approximately 66.92 hours per week. Canady's hours from mid-March 2019 through July 2019 shows Canady averaged approximately 62.26 hours per week. However, Canady pointed out for the jury that his hours from June 2018 through December 2018 averaged approximately 76.58 hours per week. The jury also heard testimony that Canady had to work in a non-supervisory role in a different division of the company to maintain his hours after he complained about the KKK comment.

conduct. Canady also stated he was unable to maintain his supervisory role while working for the other manager.

At trial, Meyer contended Canady was not fired for his opposition to discrimination; rather, Meyer stated Canady was fired pursuant to R Construction's progressive disciplinary policy. R Construction presented evidence showing Canady received three different disciplinary reprimands that it claims were the bases to terminate his employment. R Construction's handbook, which was admitted into evidence, provides that upon the first instance of misconduct, an employee will receive an oral warning. Although the warning is called an oral warning, the handbook states that the employee's supervisor will discuss the misconduct with the employee and a written "notation regarding the discussion will be made in [the employee's] personnel record for the sole purpose of documenting the oral warning." At trial, this was referred to as an oral reprimand or oral warning. Then, the handbook provides that "[u]pon the occurrence of a second infraction," the employer's supervisor and an officer of R Construction will discuss the misconduct with the employee and "[a] written [m]emo will be placed in [the employee's] personnel file in order to keep record of the infraction." At trial, this was referred to as a written reprimand or a "write-up." Although not in the handbook, Meyer testified the third step in the progressive disciplinary policy was suspension. Finally, the handbook provides that "[e]mployees who either fail to improve their performance and/or behavior following repeated warning or commit a very serious infraction will be subject to immediate termination." Notwithstanding the progressive disciplinary policy, the handbook warns that "some acts of misconduct are so severe as to be grounds for immediate termination at" R Construction's sole discretion and the progressive disciplinary policy does not modify the at-will employment relationship between R Construction and its employees. An oral warning is the lowest level of discipline and termination is the highest level of discipline.

R Construction used a form when issuing reprimands. On the form, the supervisor issuing the reprimand can check boxes indicating the reprimand is an oral warning, a written warning, suspension, or termination. The form also has a place for the supervisor to write in the infraction for which the reprimand was being issued.

*(A) The Safety Meeting*

The first reprimand R Construction argues justifies Canady's discharge was issued because Canady missed a safety meeting on June 18, 2019. Canady admitted he missed the safety meeting but testified the meeting occurred on his day off. According to Canady, R Construction had an unwritten policy that employees were not required to attend safety meetings if they were just coming off a long shift or it was their day off. Canady testified R Construction would have multiple safety meetings in the month that covered the same information so everyone could attend the safety meeting during their shift. According to Canady, each employee was only required to attend one safety meeting per month. Canady testified that he and his crew came off a fourteen-hour shift at 5:00 AM the day of the meeting, which was scheduled for 7:00 AM. According to Canady, he was off the day of the meeting and returned the next day to a nine-hour shift. Timesheets were admitted into evidence corroborating Canady's testimony.

Meyer testified the safety meeting was a "stand-down safety meeting" that everyone was required to attend even on their day off. However, his testimony was inconsistent. For example, he could not say whether he had conveyed to Canady's crew that the meeting was a mandatory "stand-down safety meeting" that should be treated differently than any other safety meeting. Meyer first stated everyone was supposed to attend safety meetings on their days off but then changed his testimony later stating it depends on what time the employee got off their shift. Meyer maintained that Canady was not off on the day of the safety meeting but then couldn't explain why

Canady did not have any hours on his paystub showing he worked the day of the meeting or why Canady's write up did not state that he failed to show up to work.

Although this was Canady's first infraction with the company, Meyer testified he skipped the oral warning in the progressive disciplinary policy and checked the box stating this was a written reprimand. The reprimand also stated that Canady refused to sign it because Meyer had left it on the bulletin board inside his office before he left town and, when he returned, it was still not signed. Canady disputed Meyer's testimony that Canady received a written reprimand and stated the reprimand was an oral write-up when it was posted on the bulletin, indicating Meyer may have changed it to a written reprimand sometime later. Canady admitted he refused to sign the reprimand because the safety meeting occurred on his day off and he was not required to attend. Canady asked Meyer why he was written up for missing a safety meeting on his day off. According to Canady, Meyer told him not to worry about the write-up because Meyer realized Canady had just gotten off a long shift before the meeting.

### (B) The Verbal Altercation

The second reprimand was issued because Canady and another coworker, CJ, got into an argument at a customer's well site on July 21, 2019. The jury heard testimony that CJ was distracted by his phone while he was running an industrial forklift. Canady told CJ to get off his phone while he was operating the forklift, which caused tension between Canady and CJ. At some point, CJ ran the forklift into one of the work trucks and busted out the windshield with the pipe that he was carrying on the forklift. Canady and CJ got into a verbal altercation, and Canady immediately contacted Meyer to report the incident. Meyer told Canady and CJ that they needed to cool down and get it together. He also told Canady to move the work truck so the customer would not see the damage or that an accident had occurred. At some point, Canady reported that

he and CJ worked out their issues, everything was okay between them, and they had finished the job.

Meyer testified he was not going to write up Canady and CJ so long as the customer did not complain. Several days later, Meyer called Canady and CJ into his office to issue them a reprimand because he alleged the customer complained about their altercation.

*(C) The RamTex Job*

R Construction has several yards in Texas from where it operates, and each yard is in a different geographical region. R Construction was hired by a company called RamTex to wash an oil rig in La Grange, Texas. Although La Grange was in the geographical region of R Construction's Buffalo, Texas yard, Canady's crew was sent from the Floresville yard to relieve a Buffalo crew that was washing an oil rig in La Grange on July 24, 2019. The third reprimand arose from this job.

R Construction was working around the clock to wash this oil rig. The Buffalo crew worked the twelve-hour shift before Canady's crew arrived and took over again after Canady's crew completed their twelve-hour shift. The jury heard evidence that this oil rig washing job was very difficult work. The crew was working in temperatures that exceeded 100 degrees and were using power washers that spray hot water to wash oil-based mud off the rig.

Meyer testified RamTex later fired R Construction because Canady's crew was lazy and took too many breaks. However, Meyer acknowledged that OSHA regulations required Canady's crew to take a break every hour of the twelve-hour shift in those conditions. Meyer also conceded he did not know how many breaks Canady's crew took during their shift or for how long the breaks lasted. There was a picture admitted into evidence showing R Construction employees taking a break. On cross-examination, Canady's counsel questioned Meyer about his deposition testimony

identifying Canady as one of the employees pictured taking a break. At trial, however, Meyer testified he could not identify the men in the picture. Both men in the picture also wore white hard hats and the jury heard testimony that only Canady wore a white hard hat in his crew, indicating the picture may have been of a different crew.

Meyer also contradicted himself at one point when he stated the Buffalo crew had to complete the job, indicating R Construction was not fired from the RamTex job. Meyer's testimony regarding Canady's crew's work ethic was also directly contradicted by Canady and Strain. Strain testified RamTex was upset when Canady's crew arrived at the jobsite because the Buffalo crew was not making any progress. Canady stated no one from RamTex complained about the work Canady's crew was doing and they were paid compliments on their work ethic when they first started their shift. Strain corroborated Canady's account stating Canady's crew made progress on the oil rig pressure washing job and RamTex employees began giving compliments to Canady's crew. Strain testified Canady's crew worked a twelve-hour shift in personal protective equipment and had to take breaks to cool off but he disputed Meyer's testimony that they were fired for taking too many breaks. Rather, Strain testified RamTex was pleased with the work done by Canady's crew when they left the jobsite.

Meyer told Canady to keep an eye on his phone because they may be sent back to La Grange to finish the job for the Buffalo crew. Canady was subsequently told that RamTex fired R Construction from the job and his crew would not be returning to relieve the Buffalo crew. However, Canady received this news after the Buffalo crew relieved Canady's crew indicating it was the Buffalo crew's work and not Canady's crew that RamTex was displeased with.

*(D) The Day Canady's Employment was Terminated*

On July 26, 2019, Meyer called Canady and CJ into his office to tell them he was issuing a written reprimand for being unprofessional on the jobsite where the forklift incident occurred. Canady said he would sign the reprimand but asked whether CJ would be further disciplined for insubordination and running the forklift into the truck. Meyer then asked CJ to leave and told Canady he was being fired for accumulating too many reprimands, referring to the safety meeting, the verbal altercation, and the RamTex job. That day Meyer issued a written reprimand for the verbal altercation that had occurred five days earlier and a second reprimand stating Canady was fired for "Insubordination—causing company to be terminated from that job[,]" referring to the RamTex job.

*Application*

Our review requires us to determine whether there was sufficient evidence for the jury to conclude that but for Canady's opposition to discriminatory conduct, R Construction would not have fired him when it did. Because Canady relied on circumstantial evidence to prove his case, we review these reprimands and the circumstances surrounding Canady's discharge by considering the factors mentioned above to determine whether there was sufficient evidence for the jury to conclude those reprimands were issued merely as a pretext to fire Canady in retaliation for his opposition to discrimination.

*(1) Temporal Proximity*

Regarding temporal proximity between Canady's complaint of the EOG mud engineer's KKK comments and Canady's discharge, the evidence shows that Canady never received a reprimand before his complaint of racial harassment. It was not until after he opposed what he perceived to be discriminatory conduct that Canady received the three reprimands R Construction

contends led to Canady's termination. Although Canady was not fired until approximately four months after Canady's first complaint, the jury heard testimony that Canady continued to press the issue with R Construction during that time period. Canady testified every time he complained about R Construction's inaction to address the EOG mud engineer's KKK remarks, his hours were reduced or he endured some form of negative reaction from R Construction. The jury also heard testimony that Canady was excessively drug tested in the months following his complaint, and that he was subjected to more monitored drug tests than other employees. When Canady complained the third or fourth time, he testified he was issued the second and third reprimand all at once and immediately terminated.

### (2) Knowledge of the Protected Activity by Decision Maker

It is undisputed that Meyer was Canady's direct supervisor. Canady immediately complained to Meyer after EOG's mud engineer made the KKK remarks to Canady's crew. It is also undisputed that in the months after Canady began complaining about the KKK comments, Meyer issued the three reprimands leading up to Canady's termination, and Meyer was the one who terminated Canady's employment for cause.

### (3) Expression of a Negative Attitude Toward Canady's Opposition to Racial Harassment.

Although Meyer testified he would take Canady's concerns to the top, the jury heard evidence that Canady was warned R Construction could lose EOG's business if Canady pursued the issue. Then, Meyer sent Manley, who was white, with Canady's crew to pose as the crew's supervisor so that he could interact with the EOG mud engineer instead of Canady. A reasonable juror could credit this as evidence suggesting R Construction was more concerned with keeping EOG's business than addressing the discriminatory conduct.

Canady testified his hours were cut by Meyer or he endured some sort of negative reaction from R Construction every time he complained R Construction was not addressing his racial harassment complaint. As mentioned above, the jury heard evidence that Canady was only able to maintain consistent hours by taking work in a non-supervisory role from another manager in the company doing a different type of work.

Moreover, the jury heard testimony that there was no meaningful investigation into the incident at the EOG jobsite. The jury could have inferred R Construction had a negative attitude towards Canady's complaint because it failed to follow its own company policy to thoroughly and promptly investigate the incident.

Based on this evidence, the jury could have concluded that Meyer's actions reflected a negative attitude toward Canady for his opposition to racial harassment and discriminatory conduct.

*(4) Employer's Failure to Adhere to Established Company Policies*

As mentioned above, Meyer did not follow company policy when Canady reported the KKK comment by EOG's mud engineer. Nevertheless, R Construction contends Canady's employment was terminated in accordance with the company's progressive disciplinary policy.

Meyer testified Canady performed well in his role when he first came to work for R Construction. Canady was never demoted and never received a reprimand before he complained about the KKK remarks from the EOG jobsite. Meyer testified issues with Canady existed prior to the incident at the EOG jobsite but Meyer was not able to support his contention with documentation even though R Construction's policy was to document oral reprimands.

Canady admitted he missed the safety meeting. However, as mentioned above, Canady testified he was following the longstanding policy that crews were not required to attend safety

meetings on their days off or when they were coming off a long shift. Meyer acknowledged crews were not always required to attend safety meetings after they came off a long shift but still maintained that Canady was required to attend the June 18, 2019 meeting. Because there was conflicting testimony on whether Canady was required to attend the June 18, 2019 safety meeting, the jury could have resolved that conflicting testimony in Canady's favor. *See Horton v. Kan. City S. Railway Co.*, 692 S.W.3d 112, 135–36 (Tex. 2024) (providing it is the jury's role to resolve any conflicting evidence and "[w]e cannot substitute our judgment for the jury's").

Canady also acknowledged his infraction when he got into the verbal altercation with CJ. Meyer initially testified the argument between Canady and CJ did not play a role in his decision to terminate Canady but then clarified that it did play a role in his decision to terminate Canady's employment. Then, Canady's counsel impeached Meyer with deposition testimony where Meyer stated the altercation with CJ did not play a role in his decision to fire Canady. Of course, the jury could have considered Meyer's equivocal testimony when assessing his credibility.

Finally, there was conflicting testimony on whether R Construction was fired from the RamTex job because of Canady and his crew or if the Buffalo crew caused R Construction to lose the RamTex job. Again, the jury could have resolved this conflicting evidence in Canady's favor. *See id.*

R Construction's progressive discipline policy anticipates terminating an employee for repeated offenses concerning the same conduct. However, none of the reprimands R Construction proffered to justify Canady's termination have the box checked saying Canady has had a similar prior offense. Although Canady acknowledged he missed the safety meeting and participated in the verbal altercation with CJ, it is not unreasonable for the jury to conclude that each of these offenses are distinct infractions that would each only warrant oral reprimands. This further lends

credence to the jury's conclusion that the reprimands were just pretexts to fire Canady for opposing racial discrimination.

The jury could have also questioned Meyer's motive for terminating Canady's employment because he failed to issue a reprimand for the verbal altercation until the day he fired Canady. Meyer admitted, however, that he is supposed to issue reprimands when the infraction occurs. Although Meyer stated he was not going to write up Canady for this altercation unless the customer who owned the well site where the altercation took place complained, the jury was entitled to disbelieve Meyer and could have instead concluded that Meyer was looking for a pretext to fire Canady.

*(5) Discriminatory Treatment in Comparison to Similarly Situated Employees*

The evidence also shows that Canady received disparate treatment from other similarly-situated employees. For example, Canady received a written reprimand when he missed the safety meeting whereas the other members of his crew that missed the meeting were all given oral reprimands. It is undisputed that this was Canady's first reprimand under the progressive disciplinary policy, and R Construction provided no explanation why Canady was treated differently from the other employees that missed the safety meeting. Meyer conceded at trial that Canady was the only employee to receive a written reprimand while the other employees that missed the meeting only received oral reprimands. Meyer also conceded this was Canady's first reprimand and could not explain why he did not receive an oral reprimand rather than a written reprimand.

The jury could also infer that Canady's crew were not told about the safety meeting because members of Canady's crew were the only employees that missed it. At the very least, the jury

could have concluded that Meyer failed to convey the mandatory nature of the meeting or that Canady would be reprimanded if he missed it.

Additionally, Meyer's handling of the verbal altercation between Canady and CJ showed disparate treatment. On Canady's reprimand, Meyer checked the box that stated the infraction adversely affected the safety of an employee or the welfare of others. However, CJ's reprimand does not have this box checked.

Finally, the jury could have concluded Canady was treated differently than every other member of his crew after the fallout from the RamTex job. Canady was terminated because Meyer blamed him for losing RamTex as a customer. The reprimands for three of Canady's crew members following the RamTex job were admitted into evidence. Two of the three reprimands have two boxes checked: one showing it was an oral reprimand and another showing the crew was suspended for two days. Although Strain's form did not have the suspension box checked, it had dates of suspension filled out. All three reprimands have the same dates of suspension filled in.

Meyer testified he terminated Canady while the rest of his crew received suspensions because Canady was the crew's supervisor and R Construction lost the customer on Canady's watch. On all three of the crew members' reprimands, the portion pertaining to suspension was filled out with red ink while the other relevant portions were filled out with blue ink. Meyer could not explain why he used two different color pens to fill out the forms other than to say he may have begun filling the forms out the day before meeting with the employees. Canady's counsel elicited testimony indicating Meyer checked the box for oral reprimand and may have added the suspension to the form after he terminated Canady to make it look like the treatment between Canady and his crew was not so disparate.

This inference is supported by Strain's testimony stating he signed his reprimand but that the suspension dates on the reprimand were not there when he signed the reprimand. He further testified he was never suspended for the RamTex fallout and Meyer never mentioned suspension when the reprimand was issued. Although the exhibits in the appellate record are in greyscale, it is clear that the suspension portion of all three reprimands were filled in with a different pen than the one used to fill out the other portions of the reprimands.

Based on this evidence, the jury could have reasonably rejected Meyer's testimony regarding the reprimands and instead could have concluded that Meyer doctored the reprimands to make it look like Canady and his crew were treated similarly and Canady was only fired because he was the supervisor. With Meyer's credibility in question, and considering Canady's last two reprimands were filled out on the same day—even though the infractions occurred on different days—the jury could have reasonably concluded that Meyer was creating documents as a pretext to fire Canady in retaliation for his opposition to the KKK remarks made by EOG's mud engineer.

"In reviewing the legal sufficiency of evidence to support a jury verdict, we honor the rule that the jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony, and it is their role to resolve any conflicts in the evidence." *Horton*, 692 S.W.3d at 135 (internal quotation marks omitted). The circumstances surrounding the reprimands—especially the inexplicable use of two different pens on the three crew members' reprimands arising from the RamTex job—is compelling evidence that permitted the jury to find that Meyer used the progressive disciplinary policy as a pretext to fire Canady for an impermissible reason.

*(6) Evidence the Stated Reason for Discharge was False*

The jury also heard evidence indicating R Construction's stated reason for Canady's discharge was false. As mentioned above, the circumstances surrounding the RamTex job and the

reprimands arising from that job were compelling evidence that Meyer's stated reason—the progressive discipline policy—was merely a pretext to fire Canady in retaliation for his opposition to the KKK remarks made by EOG's mud engineer. Thus, on this evidence, the jury could have reasonably concluded that R Construction's stated reason for firing Canady was false.

In addition, Meyer did not write Canady up for the verbal altercation with CJ until several days later when Meyer decided to fire Canady. Meyer stated he told Canady he would not write him up for the altercation so long as the customer did not complain. Meyer testified the customer later complained and that is why he issued the written reprimands against Canady and CJ. But this reprimand was issued simultaneously with the reprimand from the RamTex job. Meyer then proceeded to fire Canady because he missed the safety meeting, he got into an altercation with CJ at a customer's wellsite, and the RamTex oil rig was not cleaned properly.

The jury also could have concluded the termination from the RamTex job was a pretext to fire Canady for an impermissible reason because all the testimony from Canady's crew consistently stated they worked hard and were complimented by RamTex. R Construction was not fired from the RamTex job while Canady's crew was working. Rather, it was the Buffalo crew that was working when RamTex fired R Construction. Meyer could not confirm whether Canady's crew took breaks, how many breaks they took, or how long the breaks lasted. He could not identify the men in the picture that was provided by RamTex showing a crew taking a break. In fact, the testimony indicated it could have been an entirely different crew. Even if the evidence conclusively established Canady and his crew were the men depicted in the picture, which it does not, the jury heard evidence that OSHA requirements mandate the crew take a break every hour in the extreme heat conditions the men were working. The jury was the ultimate factfinder and could have disbelieved Meyer's testimony that Canady was fired from the fallout of the RamTex job,

especially considering the jury heard evidence that Meyer's testimony at trial was inconsistent with his deposition testimony. Rather, the jury could have believed the consistent testimony from the members of Canady's crew that they worked hard, were complimented by RamTex, and that the Buffalo crew got R Construction fired from the RamTex job. Considering all of this evidence, the jury could have reasonably concluded that the fallout from the RamTex job was simply a pretext to fire Canady for his repeated opposition to the KKK remarks made at the EOG jobsite.

The evidence regarding excessive drug testing was disputed. R Construction presented evidence that Canady was randomly selected by a third-party provider to be drug tested in May and June 2019. David Evans, a safety officer at R Construction, testified R Construction has no control over who gets selected for random drug tests. Evans also testified Canady was subjected to reasonable suspicion drug tests because his urine was not within an acceptable temperature range. Finally, Evans testified a customer requested pre-access drug tests for all R Construction employees that were to work on a particular jobsite. According to Evans, the employees were required to provide a negative drug test before they would be given access to the customer's job site. Canady testified he was subjected to many more drug tests than his peers, his drug tests were almost always observed, and he pointed out discrepancies in Evans's testimony using the drug test log. It was undisputed that Canady tested negative on every drug test he took, even when he had to take a second "reasonable suspicion" test in the same day because the company asserted his urine sample from the first test that day was not within the acceptable temperature range. While Canady's testimony was also somewhat inconsistent—and he may have been including tests that were conducted prior to the KKK incident in his allegation of excessive drug testing—the jury as the factfinder was entitled to assess the credibility of the witnesses. We cannot substitute our judgment for the jury and must disregard evidence contrary to the jury's verdict unless a reasonable

factfinder could not. Here, the jury could have found Canady's testimony more credible and concluded that he was subjected to excessive drug testing. Considering the details Canady described surrounding the drug tests and the timing, the jury could have concluded R Construction conducted drug tests that were not documented in the drug test log it admitted into evidence. While R Construction presented evidence to the contrary, the jury could have resolved the disputed evidence in Canady's favor and we will not disrupt the jury's findings.

Finally, Canady testified that one of R Construction's safety officers told Canady to get an employment lawyer because he thought Canady was being targeted after he reported the KKK comment.

In sum, the jury could have reasonably concluded Canady opposed racial discrimination and was insistent that R Construction "do something" about the treatment he received from EOG's mud engineer. The jury could have reasonably concluded that R Construction did not actively engage in a meaningful investigation into the allegations because it did not want to jeopardize its business with EOG. The jury could have also reasonably concluded that Canady's repeated complaints and insistence that R Construction take meaningful steps to address the comments made by the EOG mud engineer could pose a problem for R Construction's prospective business with EOG and, therefore, R Construction sought a pretext to terminate Canady. Considering the relevant factors under the appropriate standard of review, we conclude there was sufficient evidence for the jury to draw a reasonable inference that R Construction's proffered reasons for termination under the progressive disciplinary policy were pretexts to terminate Canady in retaliation for his opposition to racial harassment and discrimination. As such, the evidence was sufficient for the jury to conclude that but-for Canady's opposition to the racial harassment, R Construction would not have fired him when it did.

Accordingly, R Construction's first nine issues are overruled.

## BACK PAY

In its tenth and eleventh issues, R Construction contends chapter 21 of the labor code only permits recovery of back pay when it is awarded in conjunction with an order granting relief to hire, reinstate, or promote the employee.

"Issues of statutory construction are reviewed de novo." *ExxonMobile Pipeline Co. v. Coleman*, 512 S.W.3d 895, 899 (Tex. 2017). "In construing a statute, our objective is to determine and give effect to the [l]egislature's intent." *Energen Res. Corp. v. Wallace*, 642 S.W.3d 502, 509 (Tex. 2022). "[W]e presume the [l]egislature chose the statute's language with care, purposefully choosing each word, while purposefully omitting words not chosen." *In re CenterPoint Energy Hous. Elec., LLC*, 629 S.W.3d 149, 158–59 (Tex. 2021) (orig. proceeding).

However, we also recognize it is "a fundamental principle of statutory construction that words' meanings cannot be determined in isolation but must be drawn from the context in which they are used." *Willacy Cnty. Appraisal Dist. v. Sebastian Cotton & Grain, Ltd.*, 555 S.W.3d 29, 39 (Tex. 2018). "In ascertaining legislative intent, we read the entire statute as a whole and do not consider isolated sections, provisions, or terms in a vacuum." *EXLP Leasing, LLC v. Galveston Cent. Appraisal Dist.*, 554 S.W.3d 572, 582 (Tex. 2018). We presume the legislature wants all statutory provisions to be fully effective and we may insert additional words into a statutory provision only when it is necessary to give effect to the clear legislative intent. *DLB Architects, P.C. v. Weaver*, 305 S.W.3d 407, 409 (Tex. App.—Dallas 2010, pet. denied) (citing *Hunter v. Fort Worth Capital Corp.*, 620 S.W.2d 547, 552 (Tex. 1981)); *see also* TEX. GOV'T CODE ANN. § 311.021. Thus, we must construe statutes in a way that harmonizes and gives effect to the different provisions when possible. *In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 716

(Tex. 2015) (citing TEX. GOV'T CODE ANN. §§ 311.025, 311.026(a)); *Tex. Indus. Energy Consumers v. CenterPoint Energy Hous. Elec., LLC*, 324 S.W.3d 95, 107 (Tex. 2010).

Section 21.258 provides the equitable relief available to an employee from an employer who engages in an unlawful employment practice:

> (a) On finding that a respondent engaged in an unlawful employment practice as alleged in a complaint, a court may:
>
>   (1) prohibit by injunction the respondent from engaging in an unlawful employment practice; and
>
>   (2) order additional equitable relief as may be appropriate.
>
> (b) Additional equitable relief may include:
>
>   (1) hiring or reinstating with or without back pay;
>
>   (2) upgrading an employee with or without pay;
>
>   (3) admitting to or restoring union membership;
>
>   (4) admitting to or participating in a guidance program, apprenticeship, or on-the-job training or other training or retraining program, using objective job-related criteria in admitting an individual to a program;
>
>   (5) reporting on the manner of compliance with the terms of a final order issued under this chapter; and
>
>   (6) paying court costs.
>
> (c) Liability under a back pay award may not accrue for a date more than two years before the date a complaint is filed with the commission. Interim earnings, workers' compensation benefits, and unemployment compensation benefits received operate to reduce the back pay otherwise allowable.

TEX. LABOR CODE ANN. § 21.258. Subsection 21.2585(c) of the labor code states compensatory damages awarded for an unlawful employment practice does not include back pay. *See id.* § 21.2585(c). R Construction correctly contends back pay is not considered compensatory damages. However, pointing to subsection 21.258(b), R Construction argues that backpay may only be attained when the trial court orders the employer to hire, reinstate, or promote the employee. We disagree.

Subsection 21.258(a) provides that a court may "order additional equitable relief as may be appropriate" upon a finding that the employer engaged in an unlawful employment practice as alleged by the employee in a complaint. *Id.* § 21.258(a)(2). Our sister courts have held "[a]n employee that asserts a claim under the TCHRA may recover back pay as a form of equitable relief." *In re Scherer*, 684 S.W.3d 875, 890 (Tex. App.—Eastland 2024, orig. proceeding); *W. Telemarketing Corp. Outbound v. McClure*, 225 S.W.3d 658, 667 (Tex. App.—El Paso 2006, pet. granted, judgm't vacated w.r.m.) ("[T]he trial court has discretion to award back pay as equitable relief in a race discrimination lawsuit."); *Shear Cuts, Inc. v. Littlejohn*, 141 S.W.3d 264, 271 (Tex. App.—Fort Worth 2004, no pet.) ("The trial court has discretion to award back pay as equitable relief in a race discrimination lawsuit."); *Stanley Stores, Inc. v. Chavana*, 909 S.W.2d 554, 563 (Tex. App.—Corpus Christi–Edinburg 1995, writ denied) ("The trial court has discretion to award back pay as equitable relief in an age discrimination lawsuit."); *City of Austin v. Gifford*, 824 S.W.2d 735, 740 (Tex. App.—Austin 1992, no writ) (rejecting appellant's argument that back pay is not allowed under the TCHRA and holding the TCHRA "specifically allows for back pay"). We agree with our sister courts that "additional equitable relief" in subsection 21.258(a)(2) gives the trial court broad discretion to order an award of back pay, and we reject R Construction's assertion that subsection (b) requires back pay to be awarded only when hiring, reinstating, or promoting an employee.

The plain language of the statute reinforces our interpretation. In subsection 21.258(b), the legislature's use of the words "may include" in the phrase "[a]dditional equitable relief may include: . . ." indicates the list in that subsection is an example of types of equitable relief rather than an exhaustive list. *See* TEX. GOV'T CODE ANN. § 311.005(13) ("'Includes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does

not create a presumption that components not expressed are excluded."); TEX. GOV'T CODE ANN. § 311.016(1), (5) (providing "'[m]ay' creates discretionary authority or grants permission or a power" whereas "'[m]ay not' imposes a prohibition . . . ."). If the legislature had intended to exclude back pay as a form of equitable relief, it would have said so plainly. Subsection 21.258(b)(1) and (2) simply clarify that the trial court may award back pay in addition to ordering the employer to hire, reinstate, or promote the employee so that back pay and those remedies are not mutually exclusive. The phrase "with or without" indicates back pay is an optional component that can accompany these remedies; however, an order requiring an employer to hire, reinstate, or promote an employee is not a mandatory prerequisite to award back pay.

Finally, "[t]he remedies provided under the TCHRA mirror those available under Title VII of the Civil Rights Act of 1964" and "[o]ne of the TCHRA's purposes is to harmonize state and federal employment discrimination law." *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012); *see also* TEX. LABOR CODE ANN. 21.001(1) (stating one of the general purposes of chapter 21 is to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments[.]"). Therefore, we look "to federal law in applying our own statute . . . ." *Olivas*, 370 S.W.3d at 760; *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001) ("[A]nalogous federal statutes and the cases interpreting them guide our reading of the TCHRA."). Relying on the phrase providing that a court may award "any other equitable relief as the court deems appropriate" in the analogous federal statute, the Third Circuit concluded "[b]ack pay is available to a successful Title VII plaintiff under the Civil Rights Act of 1964." *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 315 (3d Cir. 2006) ("Consistent with this language, we have treated back pay as a form of equitable relief . . . .").

Accordingly, R Constructions tenth and eleventh issues are overruled.

In its twelfth issue, R Construction contends the evidence is legally and factually insufficient to support the $415,000 back pay award.

"In order for a jury award to survive a legal sufficiency challenge, there need only be some evidence that a substantial loss occurred which affords a reasonable basis for estimating the amount of that loss." *Tex. Dep't of Public Safety v. Williams*, No. 03-08-00466-CV, 2010 WL 797145, at *6 (Tex. App.—Austin Feb. 19, 2010, no pet.) (mem. op.) (internal quotation marks and alterations omitted). "While a legal sufficiency inquiry ends when some evidence to support the award is found, [a] factual sufficiency analysis also examines whether the precise amount of a jury's award is proper." *Id.* at 7. The jury has the discretion to award damages within the range of evidence presented at trial so long as a rational basis exists for the jury's calculation. *Id.* And "[s]o long as a rational basis for the calculation of damages exists, a jury's finding will not be disregarded merely because its reasoning in arriving at its figure may be unclear." *Id.* Where the evidence supports a range of potentially appropriate awards, the jury award will be factually sufficient when it does not differ greatly outside that range. *Id.*

The correct measure of back pay is the amount of money the employee would have earned had he not been terminated, less the amount the employee earned after he was terminated. *A&L Industrial Servs, Inc. v. Oatis*, No. 01-11-00471-CV, 2013 WL 5970933, at *7 (Tex. App.—Houston [1st Dist.] Nov. 7, 2013, no pet.); *Williams*, 2010 WL 797145, at *7; *Littlejohn*, 141 S.W.3d at 271. "In general, back pay liability in a wrongful termination case commences from the time the discriminatory conduct causes economic injury and ends upon the date of the judgment." *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 483 (5th Cir. 2007); *McClure*, 225 S.W.3d at 668 (calculating range of back pay in a sufficiency review from the date of termination until the month of trial).

Here, Canady was terminated on July 26, 2019, and the trial court signed the final judgment on October 29, 2024, a period of approximately 274 weeks. A timesheet showing the hours Canady worked and how much he was paid per week for the duration of his employment was admitted into evidence. Canady's time and wage sheet reflects that Canady earned $2,398.75 in one week approximately six months before he was terminated. For determining a range, the jury could have based the top end of the range on the week Canady earned the most money in wages, which was $2,398.75. *See McClure*, 225 S.W.3d at 668 ("The jury could have based lost earnings on Appellee's highest weekly earnings statement."). Multiplying the highest wage earned in a week, $2,398.75, by 274 weeks equals $657,257.50.

The jury heard testimony that Canady earned interim income of approximately $4,000 to $5,000 at another job in 2019, he earned approximately $40,000 in 2020, and he earned approximately $19,000 in 2021. Thus, the jury could have concluded the high end of Canady's back pay range after deducting his interim earnings is $593,257.50.[8]

The jury has discretion to award damages as long as the damage award is within the range of evidence presented at trial and a rational basis exists for its calculation. *Oatis*, 2013 WL 5970933, at *7; *Williams*, 2010 WL 797145, at *5; *McClure*, 225 S.W.3d at 668 (citing *Mayberry v. Tex. Dep't of Agric.*, 948 S.W.2d 312, 317 (Tex. App.—Austin 1997, writ denied)). The jury awarded back pay in the amount of $415,000, well below the high-end range of $593,257.50. Thus, the jury's back pay award is within the range of evidence admitted at trial and there is a rational basis for the jury's calculation. Because the jury's award does not differ greatly outside the permissible range based on the evidence, we conclude the evidence is sufficient to support the jury's back pay award.

---

[8] $657,257.50-$4,000-$40,000-$20,000=$593,257.50.

In its brief, R Construction proffers calculations to suggest the range of back pay was much lower. These calculations are based on an average annual salary Canady earned while he was employed by R Construction. However, most of the wages considered in these calculations were based on the sixteen-dollar-per-hour rate Canady was earning in 2018 rather than the nineteen dollars per hour Canady testified he was making when his employment was terminated. Further, Meyer testified the roustabout's hours would fluctuate and the jury heard evidence that Canady expected to work thirty to forty hours of overtime per week. R Construction argues there was no testimony regarding how much Canady would make per hour for overtime worked. But the jury could have easily calculated the overtime pay from the time and wage sheet admitted into evidence.[9]

Finally, R Construction argues neither the jury nor the reviewing court is permitted to consider lost wages for 2022, 2023, or 2024 because there is no evidence of interim earnings after 2021. R Construction does not cite any authority directly supporting this proposition. An absence of interim earnings evidence does not establish that interim earnings existed but were not considered in the calculation, such that the evidence no longer supports the back pay award. If R Construction wanted to limit its liability, it should have elicited testimony or presented evidence showing Canady had interim earnings after 2021 that would reduce the back pay award. R Construction did not.

Accordingly, R Construction's twelfth issue is overruled.

---

[9] The jury could easily calculate Canady was earning approximately $28.50 per hour of overtime. Another rational basis to support the jury's calculation is Canady's testimony that he expected to work thirty to forty hours of overtime per week. If Canady earned $19 per hour for forty hours per week, his weekly regular pay would be $760. When you add thirty-five hours per week of overtime pay (35x$28.50=$997.50), Canady's gross pay per week would be $1757.50 ($760+$997.50=$1757.50). $1757.50 multiplied by 274 weeks is $481,555. After reducing interim earnings in the amount of $64,000, the high range based on Canady's testimony is $417,555. Thus, the jury could have rationally calculated the back pay award based on Canady's testimony as well.

**COMPENSATORY DAMAGES**

In its thirteenth through fifteenth issues, R Construction challenges the sufficiency of the evidence to support the jury's award of $100,000 in past compensatory damages and $50,000 in future compensatory damages.

*(A) Past Compensatory Damages*

Here, the jury question on compensatory damages did not separate damage findings for each element of compensatory damages. Instead, the jury charge asked what sum of money would fairly and reasonably compensate Canady for his "[c]ompensatory damages in the past, which include emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other noneconomic losses." The question on future compensatory damages also includes the same list of compensatory damages. R Construction did not object to these jury questions.

"If a party does not ask for separate damage findings, it can challenge only the sufficiency of the evidence supporting the entire award of damages." *Oatis*, 2013 WL 5970933, at *9. "To challenge a multi-element damage award on appeal successfully, a party must address all of the elements of damages and show that the evidence is insufficient to support the entire damage award." *Id.*

R Construction argues the evidence is insufficient to support an award for mental anguish because the record lacks evidence of the nature, duration, and severity of mental anguish sufficient to show a substantial disruption in Canady's daily routine or a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *See Anderson v. Durant*, 550 S.W.3d 605, 618–19 (Tex. 2018). Then, R Construction contends no meaningful distinction exists between mental anguish and loss of enjoyment of life. Therefore, it argues an award for loss of enjoyment of life must fail for the same reasons that an award for mental anguish

fails. A similar argument was rejected by a federal court that concluded: "Loss of capacity for enjoyment of life is conceptually distinct from mental anguish." *Chacon v. Copeland*, 103 F.Supp.3d 827, 838 (W.D. Tex. 2015) ("For example, a person might lose a foot in an accident, and experience pain and mental anguish; but once the body heals and the anguish fades, the harms the person suffers given the loss of the foot, such as difficulty ambulating, or inability to participate in certain recreational activities, still remain, and are compensable."). For the reasons explained in *Chacon*, and because the legislature listed these elements of compensatory damages separately in subsection 21.2585(d) of the labor code, we likewise conclude they are separate and distinct elements of damages *See id.*; TEX. LABOR CODE ANN. § 21.2585(d).

Here, the record contains evidence that would certainly support the award of compensatory damages for the loss of enjoyment of life but also tends to support an award for emotional pain and suffering.[10] The jury heard testimony that after Canady was terminated, he could no longer afford basic living costs. Canady testified he lost his house and his vehicle because he could not afford rent or the car payment, and he was forced to move in with his mother and sleep on her couch. Notably, Canady testified the financial burden forced him to send his three oldest children to live with their mother six months before trial because he could not afford to raise them after he was terminated. The Supreme Court has "declared it plain beyond the need for multiple citation that a natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotation marks omitted). Canady testified his wrongful discharge strained his relationship with his children. Canady explained that he had full custody of

---

[10] In its fifteenth issue, R Construction asks us to determine whether there must be evidence in the record that directly supports the amount of mental anguish damages awarded pursuant to *Gregory v. Chohan*, 670 S.W.3d 546, 560–62 (Tex. 2023). Because we need not address the mental anguish element of damages, it is not necessary for us to determine the binding effect of *Gregory*. Therefore, we decline to address this issue.

his three oldest children for fifteen years before he had to send them to live with their mother. He told the jury that he tried to raise his children to stand up for what's right, but he testified that when he stood up for what's right, he lost everything, including his children. Canady stated his inability to live up to the example he strived to set for his children was humiliating, stripped him of his pride, and caused him to lose weight. Canady further testified he hopes he can get his children back one day when he is able to support them again.

Assuming without deciding there must be evidence of the nature, duration, and severity of Canady's loss of enjoyment of life to support the jury's award, we conclude Canady satisfied this burden. He testified he had full custody of his children for most, if not all, of their lives. Six months before trial, Canady had to give up this right because he could no longer afford to rear his children after he was wrongfully discharged. The loss of enjoyment of life with his children is significant when considering he previously had full custody of the children before his termination and, after termination, he was completely unable to care for them or be present in their daily lives. *See Dehnel*, 2024 WL 3282541, at *30 (stating, as an example, testimony about "losing time with family and friends and other substantial impacts on family relationships" is sufficient nature, duration, and severity evidence to support an award of mental anguish damages).

For these reasons, we hold this record contains sufficient evidence supporting the jury's $100,000 award for loss of enjoyment of life. *See Smith v. Harrah's New Orleans Mgmt. Co.*, 213 F. App'x. 353, 361 (5th Cir. 2007) ("A plaintiff is entitled to recover damages for loss of life enjoyment if he proves that his lifestyle was detrimentally altered or if he was forced to give up activities because of his injury."); *Chapin v. Mid-States Motors, Inc.*, No. 1:06-CV-34-TS, 2007 WL 2164527, at *1 (N.D. Ind. July 25, 2007) (concluding sufficient evidence supported a $100,000 award for emotional suffering, in part because the plaintiff testified "he was humiliated

and depressed, he lost physical custody of his children, . . . , he lost his house, he had difficulty sleeping, and he had stomach pains" after he was wrongfully discharged); *Harris v. Reneau, Inc.*, No. 2:20-CV-00849-MHH, 2021 WL 3270495, at \*7 (N.D. Ala. July 30, 2021) (concluding evidence was sufficient to support a $50,000 award of compensatory damages when, as a result of wrongful termination, the plaintiff's car was repossessed, she and her children were evicted from their apartment, she was unable to eat some nights because she had only enough food for her children, and she was afraid that she would lose custody of her children supported an award of compensatory damages).

Accordingly, we overrule R Construction's thirteenth issue.

*(B) Future Compensatory Damages*

In its fourteenth issue, R Construction challenges the sufficiency of the evidence to support the jury's $50,000 award of future compensatory damages. We agree.

To recover future compensatory damages, Canady had to show that there is a reasonable probability that he will suffer such damages in the future. *Perez v. Arredondo*, 452 S.W.3d 847, 860 (Tex. App.—San Antonio 2014, no pet.). The record does not contain any evidence that Canady will continue to suffer any loss of enjoyment of life or emotional pain in the future. There is no evidence that he is no longer the managing conservator with the right to designate the children's primary residence such that he will not be able to reclaim full custody of his children after he is made whole from the judgment in this case. Likewise, there was no evidence of any future mental anguish, emotional suffering, or other economic and non-economic losses.

Accordingly, we sustain R Construction's fourteenth issue.

## PUNITIVE DAMAGES

In its sixteenth issue, R Construction contends the evidence is insufficient to support the $50,000 award of punitive damages.

An employee may recover punitive damages from a non-governmental employer if the employee proves the employer engaged in a discriminatory practice with malice or reckless indifference to the employee's state-protected rights. TEX. LABOR CODE ANN. § 21.2585(b). The plaintiff bears a clear and convincing burden of proof to recover punitive damages. TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(b). Clear and convincing evidence is the degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Id.* § 41.001(2).

"In reviewing the legal sufficiency of evidence to support a finding that must be proved by clear and convincing evidence, a [reviewing] court must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 866 (Tex. 2017) (internal quotation marks and alterations omitted). "[T]he reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* (internal quotation marks omitted).

Similarly, in a factual sufficiency review, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing, and we consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor

of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

The jury question on punitive damages tracked the statutory language and asked the jury whether it found by clear and convincing evidence that R Construction retaliated against Canady with malice or with reckless indifference to Canady's right to be free from retaliation for opposition to discriminatory practices. Clear and convincing was properly defined as the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established. Malice was defined as "a specific intent by R Construction to cause substantial injury of harm to Canady and/or that R Construction acted with reckless indifference towards Canady's legally-protected rights."

"[E]vidence of retaliation alone is generally insufficient to support an award of punitive damages; otherwise, punitive damages would be awarded automatically in every retaliation case." *Ancira Enters., Inv. v. Fischer*, 178 S.W.3d 82, 94 (Tex. App.—Austin 2005, no pet.). "Thus, not every sufficient proof of pretext and discrimination is sufficient proof of malice or reckless indifference." *Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 439 (5th Cir. 2022) (internal quotation marks omitted). The terms "malice" and "reckless indifference" focus on the actor's state of mind. *Id.* "Both 'pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination or retaliatory conduct.'" *Id.* (alterations omitted) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999)); *see also Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 663 (Tex. 2012) ("And malice might also exist when an employer knows the retaliatory firing is unlawful and does it anyway."). In addition, evidence that the employer failed to respond effectively to discrimination complaints may be sufficient to sustain an award of punitive damages. *Wantou*, 23 F.4th at 440 ("When 'Wal-Mart failed to

respond effectively to [discrimination complaints],' the Fifth Circuit has found sufficient evidence to sustain an award of punitive damages." (quoting *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 286 (5th Cir. 1999))).

Here, as fully explained in the section above regarding the sufficiency of the retaliation claim, Meyer conceded he had an obligation to investigate Canady's complaints of racial discrimination and report it to the human resources department. However, Meyer could not recall if he reported the discrimination to human resources. Instead, a member of the sales team allegedly investigated the claim, though Meyer admitted he was unaware any formal investigation actually occurred or whether there was a report or documentation of the alleged investigation. Meyer claimed Canady did not want to push the issue any further, but the jury could have rejected Meyer's excuse considering Canady vehemently disputed this contention with his own testimony. The jury could have also rejected Meyer's testimony that he interviewed Canady's crew regarding the EOG mud engineer's remarks because it heard testimony from one of Canady's crew members that the crew member was never interviewed or asked about the KKK remarks. Based on this disputed evidence, the jury could have formed a firm belief or conviction that R Construction failed to effectively respond to Canady's complaints of racial harassment and instead fired him in retaliation for his opposition to discriminatory conduct.

More importantly, however, the jury heard testimony Meyer may have falsified the reprimands of Canady's crew following the RamTex job to make it look like Canady was not being treated so disparately from his crew members. One of the main reasons R Construction argued it terminated Canady was because his crew lost RamTex as a customer. In fact, this was the only reason written in Canady's termination reprimand. Meyer testified this was a serious infraction and stated he suspended the other members of Canady's crew as well. However, Jeramee Strain

testified he was only given an oral reprimand following the fallout from the RamTex job and the suspension portion filled out in red ink must have been added after he signed the reprimand. The reprimands of Canady's crew members were introduced into evidence. The jury heard testimony and could see that while most of the reprimands were filled out with one pen, the suspension portions of each reprimand was filled out with a different pen. It appears the same pen was used to fill the suspension portions of each member of Canady's crew, indicating the suspension portions of each reprimand were all filled out at the same time. The jury could have rejected Meyer's testimony that he suspended other members of Canady's crew after the RamTex fallout and instead believed Strain's testimony that the crew members were only given oral reprimands. The jury could have then reasonably concluded that Meyer added suspension to each of the crew members' reprimands after he fired Canady to make it look like Canady was treated similarly to his crew members for losing the RamTex account. On this pretext, Meyer could later say Canady was fired rather than suspended because he was the crew leader, which is how Meyer justified Canady's firing at trial. Based on this evidence, the jury could have reasonably formed a firm belief or conviction that Meyer sought to cover his tracks by falsifying documents because he knew terminating Canady would violate Canady's legally protected right against retaliation and chose to do it anyway. Therefore, we conclude there is sufficient evidence to support the jury's finding that R Construction retaliated against Canady with malice or reckless indifference to his legally protected rights.

Accordingly, we overrule R Construction's sixteenth issue.

### ATTORNEY'S FEES

Section 21.259 of the labor code permits the trial court to award reasonable attorney's fees as part of the costs to a prevailing party in a proceeding under chapter 21. *See* TEX. LAB. CODE

ANN. § 21.259. In its seventeenth issue, R Construction argues to the extent our disposition in this appeal changes Canady's status as a prevailing party then we should also reverse the award of attorney's fees. However, our disposition does not change Canady's status as a prevailing party.

In the alternative, R Construction argues to the extent that some of the damages are removed from the judgment, we should remand the cause so the trial court can reassess the amount of reasonable and necessary attorney's fees. R Construction does not cite any authority for this proposition; therefore, this issue is waived for inadequate briefing. Even if we did not find waiver, Canady was the prevailing party and recovered back pay, past compensatory damages, and punitive damages notwithstanding our judgment striking future compensatory damages. Attorney's fees are not segregated by damages, but rather by claims. *See Kinsel v. Lindsey*, 526 S.W.3d 411, 427 (Tex. 2017) ("[A] claimant must segregate legal fees accrued for those claims for which attorney's fees are recoverable from those that are not."). Here, Canady prevailed on his claim for retaliation. Therefore, he is entitled to his reasonable and necessary attorney's fees. R Construction does not challenge the sufficiency of the evidence supporting the reasonableness or necessity of attorney's fees.

Accordingly, R Constructions' seventeenth issue is overruled.

### CONCLUSION

We reverse the trial court's judgment awarding Canady $50,000 in future compensatory damages. We affirm the trial court's judgment in all other respects.

Irene Rios, Justice